# EXHIBIT A



18 February 2009

# EBK investigation of the cross-border business of UBS AG with its private clients in the USA

## Summary Report



Schwanengasse 2, 3003 Bern
Phone +41 (0)31 327 91 00, Fax +41 (0)31 327 91 01
**www.finma.ch**



## Summary

*The present report of the Swiss Financial Market Supervisory Authority (FINMA) states the reasons for and results of proceedings conducted by the Swiss Federal Banking Commission ("EBK") between May and December 2008 which were closed by an injunction. The FINMA wrote this summary report because the EBK, being one of three supervisory authorities, has been merged into the FINMA as of 1 January 2009.*

*After preliminary inquiries the EBK opened supervisory proceedings against UBS AG in May 2008 which it closed with an injunction against UBS AG on 21 December 2008 after having gathered extensive evidence. The main topic of these proceedings was the question whether UBS AG has adequately captured, limited and supervised the legal and reputational risks which are associated with the implementation of the Qualified Intermediary Agreement ("QIA") and with the American supervisory restrictions of the cross-border business with U.S. persons ("SEC restrictions").*

*The EBK established in its injunction that UBS AG violated the requirement for fit- and properness as well as the organizational obligations set out in the Swiss Banking Act. Individual employees of UBS AG have, in a limited number of cases and contrary to the provisions of the QIA, considered client documents, which were drafted for U.S. tax purposes, sufficient whereas they knew or should have known that these documents do not correctly reflect the client's tax status. In addition, they ignored the SEC restrictions over a longer period of time, which provide for a mandatory license for cross-border financial services to U.S. investors. As a result, UBS AG exposed itself to massive legal and reputational risks, which materialized in the proceedings opened by several U.S. authorities.*

*Within the scope of its investigation, the EBK did not assert a negligent implementation of the QIA by UBS AG. The EBK did also not come to the conclusion that the top management of UBS AG knew about the afore mentioned fraudulent conduct by U.S. clients to the disadvantage of the U.S. fiscal authorities or of the violation of SEC restrictions committed by individual employees contrary to instructions. Nevertheless, the EBK barred UBS AG in its injunction from further operating the cross-border Private Banking business with persons having their residence or domicile in the USA. It obliged UBS AG, to adequately capture, limit and supervise the legal and reputational risks inherent to cross-border services and it ordered an audit of the implementation of this instruction. It imposed the bank to pay the procedural costs in the amount of more than half a million Swiss francs. This injunction was brought to UBS AG´s knowledge in December 2008 and has become effective in the meantime.*

*The EBK proceedings took place approximately at the same time as proceedings conducted by the U.S. Securities and Exchange Commission („SEC"), the U.S. Department of Justice („DoJ") and the American tax authority, the Internal Revenue Service („IRS"). The EBK provided administrative assistance to the SEC and the DoJ.*



# Table of contents

Summary .................................................................................................................................2

1   Investigations of American authorities against UBS AG ...............................................4

2   EBK Investigation...........................................................................................................4

3   The Qualified Intermediary Agreement ..........................................................................5
    3.1   How did the Qualified Intermediary Agreement come about? .................................5
    3.2   What is being regulated by the QIA? .......................................................................7

4   Cross-border Private Client business into the USA: U.S. framework requirements..................9
    4.1   SEC Restrictions .....................................................................................................9
    4.2   The "deemed sales rules" under U.S. tax law.........................................................9

5   2001 - UBS AG becomes a „Qualified Intermediary"..................................................11

6   Results of the investigation and sanctions of the EBK ................................................12
    6.1   Incorrect implementation of the Qualified Intermediary Agreement by UBS AG ...................12
    6.2   Partial non-compliance with SEC restrictions .......................................................14
    6.3   Increasingly difficult offshore Private Banking of UBS AG for U.S. clients ...........15
    6.4   Responsibility on management level.....................................................................16
    6.5   Sanctions...............................................................................................................17



## 1 Investigations of American authorities against UBS AG

In September 2007, the DoJ contacted representatives of UBS AG and informed them that it was in possession of a letter regarding the internal investigation by UBS AG in connection with the "Whistleblowing" by Bradley Birkenfeld, a former client advisor in Private Banking North America with UBS AG in Geneva. At first, DoJ requested to keep related documents at its disposal. Eventually, DoJ opened an investigation and began to request more and more information on the cross-border Private Banking activities in the USA and on the adherence to the QIA. The bank reacted to these DoJ requests and allegations by immediately initiating an extensive internal investigation. In the course of its investigation the DoJ detained the person responsible for the North America business of UBS AG for a period of several of months as "material witness" and questioned several client advisors as well as managers in the USA. In November 2008, the DoJ caused the Grand Jury of the United States District Court of the Southern District of Florida to charge Raoul Weil, the currently suspended CEO of the business section Global Wealth Management & Business Banking („GWM&BB"), with „Conspiracy in violation of 18 U.S.C. §371". This act was made public without prior disclosure vis-à-vis the bank or Raoul Weil.

Around the same time and in close coordination with the DoJ, the IRS also opened an investigation. It analyses, to what extent U.S. clients of UBS AG have violated their tax duties. The IRS requested information from UBS AG relating thereto as well as to the bank's compliance with its obligations as a Qualified Intermediary ("QI"). The SEC commenced its investigation at the same time as the DoJ. It investigated the compliance with the SEC restrictions in connection with the performance of cross-border financial services into the USA.

## 2 EBK Investigation

After preliminary inquiries, the EBK opened an administrative proceeding against UBS AG on 23 May 2008 and examined four questions, which concern the (present) business unit GWM&BB (formerly referred to as: business unit Private Banking UBS Switzerland, subsequently Wealth Management & Business Banking):

(1) Has UBS AG or have its employees respectively participated actively in tax fraud of its clients?
(2) Has UBS AG, in the context of its obligations as QI or otherwise made false statements or provided false reports to American authorities, namely to the IRS?
(3) Did violations of the QIA by UBS AG occur and if so, how severe were these?
(4) How did UBS AG and how did its employees deal with the legal risks, which resulted from the cross-border business into the USA in connection with the QIA?

The EBK finalized its comprehensive investigation with an injunction on 21 December 2008.



## 3 The Qualified Intermediary Agreement

### 3.1 How did the Qualified Intermediary Agreement come about?

The USA levies, *inter alia*, a withholding tax in the amount of 30% ("NRA Withholding Tax") on interests and dividends that are deriving from U.S. securities and are payable to a person who is not a U.S. resident („Non-Resident Alien" or „NRA"). The U.S. Withholding Agent is responsible for the levying and the delivery of the NRA Withholding Tax. Investors, who are domiciled in a country bound by a double tax treaty (*Doppelbesteuerungsabkommen,* "DBA") with the USA, may assert full or partial deduction of this tax. In most cases, the deduction of the withholding tax amounts to a reduction to 15% on dividends and to 0% on interest. Apart from specific exceptions, the proceeds generated through a sale of U.S. securities are not subject to a withholding tax.

Generally, no withholding tax is levied on payments which are credited to a U.S. person. Instead, the taxation of such proceeds is carried out through a reporting procedure to the IRS. The U.S. paying agent, particularly the banks, must possess an IRS-form W-9, by means of which the recipient of benefits confirms, subpoenal, that he is a U.S. person and that the indicated identification number for tax payers („tax payer identification number", or „TIN") is correct. Based on the details of this declaration, the paying agent, respectively the withholding agent, provides a standardized notification (the so-called "1099 Reporting") to the IRS. If the Withholding Agent cannot provide this report due to incorrectly or incompletely reported details, he raises a "Backup Withholding Tax" with reference to the respective payments, namely the U.S. Withholding tax of currently 28% (originally 31%).

At the end of 1997, the IRS enacted a new provision regarding the handling of the NRA Withholding Tax and the respective reporting. This provision was meant to affect payments of dividends and interest from U.S. sources, which were paid from 1 January 2001 onwards. The main reason for this amendment was the aspiration to prevent the widespread misapplication of DBAs in the context of deductions on dividends. Pursuant to the method previously in place, the deduction of withholding tax based on a DBA was based on the so-called "Address-Method". According to that method, the entitlement to reduce the U.S. Withholding tax was assessed solely by the address of the recipient of payments set out in the documentation. Such recipient could also refer to a bank's address, with which the client held his account/depot relation. Therefore, an address in a DBA-country was until then enough to claim a tax deduction.

The provisions passed in 1997 which were supposed to become effective on 1 January 2001 included very high requirements concerning the identification and documentation of the recipient of proceeds from U.S. sources. The initially contemplated provision set out that even if a person had not been subject to tax in the USA (NRAs), such person would only have been able to claim deductions from the NRA Withholding Tax based on a DBA if he had revealed his identity to the U.S. Withholding Agent. These extensive disclosure and reporting provisions led to substantial concern in the affected (financial services) circles, most notably with reference to the U.S. depot banks. At the end of the 90s, a



delegation of the American IRS started talks with foreign financial centers to discuss possible solutions.

The IRS finally established the so- called „Qualified Intermediary"-System („QI-System") as an alternative to these extensive disclosure and reporting duties. It is based on the basic idea that the U.S. Withholding Agent's requirement to know the identity of those recipients of benefits whose payments he effected, is transferred to a (foreign) qualified financial institute, the so-called "Qualified Intermediary" ("QI"). Pursuant to this system, the QI incurs the determination of the identity of the recipient of benefits ("Beneficial Owner"[1]) and, as the case may be, the deduction of withholding taxes on dividends and interest. In return, the U.S. Withholding Agent will be released from this task. Only financial institutes could (and can) sign a QIA with the IRS, which commit to comply with the client identification provisions („Know Your Customer Rules") deemed sufficient by the IRS. The QI-System further envisages that external auditors control repetitively whether the QI performs the client allocation correctly and whether the necessary client documentation is available in each case.

> **Text box 1:    Objectives pursued with the QIA**
>
> The IRS pursued various objectives with the worldwide execution of QIAs: (1) Primarily, NRAs were supposed to be recorded in such manner that the reduction of U.S. withholding tax based on a DBA could only benefit those beneficiaries who were in fact privileged through a DBA. (2) At the same time, U.S. taxable persons were not supposed to invest in the USA any longer without declaring the respective investments. (3) All income derived from U.S. sources, particularly U.S. securities, was supposed to be recorded in a correct fiscal manner. (4) Finally, the determination of the identity of the Beneficial Owner was supposed to be externalized newly within the meaning of a fundamental system change and was supposed to be made the subject of the preferred contact person, the QI.

Banks not domiciled in the USA and Clearing Organizations which sign a QIA with the IRS may claim the deductions of withholding tax for their clients who are not subject to tax in the USA (NRAs), without having to disclose the identity of the recipients of such benefits. This is of particular importance for non-U.S. banks, which would like to offer direct investment opportunities into U.S. securities for their domestic and foreign clients who are not U.S. persons.

The QIA contains special provisions on the treatment of clients who are U.S. persons. In principle, these provisions envisage that the QI makes investments by U.S. persons in U.S. securities impossible, unless such U.S. persons consent to the disclosure of their identity to the U.S. Withholding Agent and therewith the IRS. In situations, in which the disclosure of information about an account holder is prohibited pursuant to the applicable law – such as the Swiss Banking Secrecy – a QI may be obliged in addition to observe information  and backup withholding duties on an anonymous basis.

---

[1] This is a technical term derived from the QIA or the U.S. tax law respectively, which is not to be confused with the term "Beneficial Owner" pursuant to Swiss money laundering provisions.



## 3.2  What is being regulated by the QIA?

The QIA is a model agreement that is used by the IRS worldwide. The agreement contains a choice of law clause in favour of U.S. federal law. The interested financial intermediaries sign a standard text without the possibility to change or adapt the agreement individually. As a contractual partner of the IRS, the QI takes over far reaching documentation, reporting and withholding duties. The requirements regarding these duties and regarding the diligence necessary derive from the agreement and, because of the references therein partially from U.S. tax law.

To fulfil its obligations under the QIA, the QI is – amongst others - required to categorize its clients with a deposit account according to certain criteria.

Key is the classification of clients into U.S. and non-U.S. persons, respectively Non-Resident Aliens. At the time of the implementation of the QI system, this led to QIs worldwide approaching their clients and asking for a declaration regarding their U.S. tax status:

- *U.S. persons* within the meaning of U.S. tax law (this includes amongst others also Green Cards Holders) had the choice to (i) sign a W-9 form and in doing so disclosing their identity to the IRS (so-called W-9 clients); (ii) refrain from disclosure and sell all U.S. securities before 1 January 2001 when the QIA came into force (so-called non-W-9 clients); or (iii) refrain from disclosure, continue to hold U.S. securities and accept to pay an (anonymous) withholding tax of 31% on all so-called "reportable payments" (also called non-W9 clients). It was (and is) expected under the QIA that the number of clients falling under the last category is kept to a minimum.

- *Non-U.S. persons* holding U.S. securities were asked to confirm their status as non-U.S. persons on a form W-8BEN or through other adequate documentation (Non-Resident Aliens or NRA-clients). The QI had to deduct a withholding tax of 30% on income from U.S. sources from NRA clients with an insufficient QI documentation.

When creating a QI-compatible documentation, the QIs faced the procedural difficulties that the U.S. person they actually were in contact with was not the client in a technical sense, but instead the client was an offshore structure (mostly domiciliary companies such as for example foundations or trusts etc.): According to U.S. tax law structures are either "per se" considered to be the beneficial owners of the assets held (e.g. a Swiss Aktiengesellschaft is considered a "per se Corporation") or they can opt so under the "check-the-box-rule".

In case of a so-called non-tax-transparent "Non-Flow-Through Entity", the beneficial owner of that entity does not have to be disclosed to the IRS under the QIA (for example the shareholder of a Non-Flow-Through structure). In this case, the structure respectively the acting corporate bodies of the structure declare that the structure itself is the beneficial owner of the assets. If the structure is incorporated under U.S. law (and thus is a U.S. person), its corporate bodies sign a W-9 form. If the structure is founded under foreign law (and thus is a non-U.S. person), they sign a W-8BEN form. Such a



structure, however, has the option according to the "check-the-box-rule" to be treated as tax-transparent – contrary to the actual qualification.

In case of tax transparent structures (so-called "Flow Through Entities"), the structure respectively the corporate bodies of the structure have to sign a form W-8IMY. Thereby, the structure declares it is holding the assets (simply) as *financial intermediary*. In addition, the beneficial owners of the structure are obliged to sign either a form W-9 (U.S. persons) or a W-BEN (non-U.S. person, respectively NRAs) in accordance with their U.S. tax status. Because of a special regulation, it was not necessary to disclose the beneficial owners of Flow-Trough foundations and trusts that were non-U.S. persons and protected by client banking secrecy. Such a structure, however, has the option according to the "check-the-box-rule" to be treated as non-tax-transparent – contrary to the actual qualification.

The difficulty in assessing the beneficial owner of assets held by offshore structures consists especially in finding out when an independent, fiscally non-transparent Non-Flow-Through structure is considered a "sham" or "mere conduit" under U.S. tax law and, as a result of that, one has - for U.S. tax purposes - to look through the structure to the beneficial owner standing behind it. No reliable guidelines exist to answer the question, when a structure is a "sham" or "mere conduit". In general, it was assumed that the mere knowledge derived from the Swiss Form A that the beneficial owner behind a domiciliary company is a U.S. person does not in and by itself lead to the qualification as "sham" or "mere conduit" structure.

The situation is clear inasmuch as the QI bank is not allowed to rely on the declaration that the structure itself is the beneficial owner of the assets given by the corporate bodies of a structure on a form W8-BEN, if it has knowledge of deceptive or fraudulent manoeuvres (for example sham structures) or other specific circumstances. In the past, the IRS has, however, neither explicitly asked nor implicitly expected an examination of the domiciliary companies' substance. Respective controls were so far never subject of the external QI audits required by the IRS.

> **Text box 2:** *Client identification by Swiss QIs according to the QIA*
>
> Special formalities for client identification by Swiss QIs in accordance with the QIA are laid down in an annex to the QIA, the so-called "Attachment for Switzerland". Accordingly, all documentation created in accordance with the requirements of the Attachment for Switzerland is considered as "Documentary Evidence" within the meaning of the QIA and has been put on a par as a method of identification with the use of official IRS forms. The KYC-Rules acknowledged by the IRS are based on the one hand on the Swiss KYC-rules, but are on the other hand amended with certain additional questions regarding U.S. tax obligations.
>
> For the assessment whether a client is a U.S. person or a non-U.S. person as well as for the determination as to whether a client is the beneficial owner of certain assets, a QI bank, according to the QIA, is allowed to generally assume that an IRS form (W-9, W-8BEN, W-8IMY) properly filled out by the client reflects the truth, respectively that the client data collected in accordance with the KYC-rules accepted by the IRS is correct.
>
> During the negotiations for the QIA, the IRS had (orally) confirmed that a Form A used for the assessment of the beneficial owner in accordance with Swiss anti-money laundering law was not relevant for QI purposes. For as-



> sessing the beneficial owner in accordance with U.S. tax law, the QI bank can thus generally rely on a signed IRS form or an adequate substitute it its possession. Potential discrepancies to a Form A in possession of the QI are generally irrelevant.
>
> However, according to the QIA the QI is not allowed to rely on the documentation, if it has actual knowledge that the information or the declarations are unreliable or incorrect. Different opinions exist on when "actual knowledge" is given. Reliable guidance from the authorities applying the regulations does not exist. If a QI, because of reasons specifically described in the QIA, has reason to know that despite a contradicting declaration a client could be a U.S. person it is not allowed to rely on the QI client documentation without further inquiries.

## 4  Cross-border Private Client business into the USA: U.S. framework requirements

### 4.1  SEC Restrictions

Various U.S. laws (*inter alia* the „Securities Act of 1934", the „Securities and Exchange Act of 1934" and the „Investment Advisers Act of 1940") as well as further rules and regulations deriving from the aforementioned Acts limit the provision of cross-border financial services into the USA. The SEC is responsible for the enforcement of these provisions which explains the terminology "SEC restrictions" in this report. Pursuant to these provisions a foreign unit is subject to the respective U.S. restrictions, if it provides specific services to U.S. persons in the USA thereby using "U.S. Jurisdictional Means". Each communication from a foreign country into U.S. territory is considered „Use of U.S. Jurisdictional Means" (e.g. per e-mail, telephone, fax, regular mail) as well as travel activities on the Interstate Highways. Particularly the activity as broker or dealer (client trader or independent dealer) and the investment advice to U.S. persons in the USA constitute in general a duty to get authorized by the SEC. The U.S. legislator has furthermore enacted provisions, with which financial products need to comply, if they are offered to U.S. persons.

The SEC restrictions are diametrically opposed to the approach of the Swiss financial markets regulation. For example, a foreign financial intermediary may perform the services as broker, dealer or investment advisor described above cross-border into Switzerland without an authorization by FINMA being required. Only the distribution of foreign collective investments and structured products and also insurance services are regulated in Switzerland.

### 4.2  The "deemed sales rules" under U.S. tax law

Conceptually, similarities exist between the SEC restrictions and the so-called "Deemed Sales Rules" of the U.S. Treasury Regulations: according to these rules, a sale of securities which otherwise would have been deemed as having taken place in an office *outside* of the U.S. will be deemed as having taken place *inside* the U.S., if there is a certain connection to the USA. Such sales are therefore subject to reporting- and / or backup withholding duties. This kind of connection to USA exists, if the client has opened an U.S. account with an U.S. office of the broker or if the client has given instructions from



within the USA per mail, telephone, electronically or otherwise concerning this sale or other sales (exception: this instruction from within the USA was given only "*in isolated and infrequent circumstances*"). Similarly, the Deemed Sales Rules apply, if the gross proceeds from the sale has been transferred to a client account within the USA or to an address of the client within the USA, if the client's selling order confirmation has been mailed to an U.S. address, if a branch of the respective broker in the USA has coordinated the sale with the client or receives instructions from the client regarding the sale.

The QIA contains explicit reporting and backup withholding duties relating to gross proceeds coming from the sale of U.S. securities. The QIA does not contain an explicit provision according to which the Deemed Sales Rules are applicable to non-U.S. securities.

At the time the QIA entered into force, the financial intermediaries were obviously well aware that there could be a duty on the QI-bank to notify the IRS when U.S. persons traded non-U.S. securities, if the Deemed Sales Rules was applicable to a transaction. Even today, the applicability of the Deemed Sales Rules is controversial and has at least been intermittently purported by U.S. authorities. According to the available information, the QI financial intermediaries have not yet reached a reliable, conclusive answer of this U.S. legal issue. This resulted in considerable legal uncertainty: In favour of the applicability of Deemed Sales Rules (on non-U.S. securities) it can be argued that Sec. 2.44(B) (2) and (3) QIA explicitly states that brokerage proceeds from the sale of U.S. securities are treated as "reportable payments". Sec 2.44 (B) QIA does not explicitly deal with brokerage proceeds from the sale of non-U.S. securities. In the FAQ relating to the QIA published on the IRS' website, the IRS is of the opinion that Sec. 2.44 (B) (4), which deals with certain payments of income from foreign sources, should be interpreted in a way that proceeds of securities transactions are included therein. However, an argument against the applicability of the Deemed Sales Rules is that the QIA does not contain any reporting- or backup withholding duties of proceeds coming from the sale of non-U.S. securities (therefore proceeds from the sale of non-U.S. securities would not be "reportable payments"). The latter view is being held today by UBS AG.

> *Text box 3:    SEC Restrictions und Deemed Sales Rules: Parallelisms*
>
> There is no obvious connection between SEC restrictions and tax consequences based on the Deemed Sales Rules. However, there are parallels: The Deemed Sales Rules are, *inter alia*, relevant when a client gives sales orders for securities from within the USA more often than in an isolated and infrequent manner. The SEC restrictions apply to contacts – a single contact is enough - with the client in the USA, as soon as "U.S. Jurisdictional Means" are used and this results in the sale of a security. Both the Deemed Sales Rules and the SEC restrictions refer to clients domiciled in the USA. The definition of "domicile" is specified in the QIA in connection with the U.S. Internal Revenue Code, respectively the SEC restrictions. The fiscal Deemed Sales Rules as well as the SEC restrictions are not limited to US securities, but also apply to the sale of non-U.S. securities.
>
> In taking corresponding measures it is possible to avoid the applicability of the (diverging) legal consequences: the Deemed Sales Rules and the SEC restrictions are not applicable, if there are no longer contacts between client and the bank regarding securities.



## 5      2001 - UBS AG becomes a „Qualified Intermediary"

In the beginning of 2000, UBS AG operated a comprehensive Private Banking business with U.S. clients it took over from its predecessors *Schweizerischer Bankverein* and *Schweizerische Bankgesellschaft*. These clients either held an account / custody account directly with UBS AG or indirectly as beneficial owner of a domiciliary company. This business was conducted out of the North America Unit (NAM-business) within the bank. At the same time, UBS AG operated in a limited manner the „onshore" Private Banking in New York. With the acquisition of the U.S. broker and asset manager PaineWebber Group, Inc. („PaineWebber") with approximately 30'000 employees at the end of 2000, UBS AG became an important onshore Private Banking provider in the USA and at the same time one of the largest asset managers worldwide.

After signing the QIA which became effective as of 1 January 2001, UBS AG as QI was obliged to obtain and retain reliable documentation from all of its clients holding U.S. securities which gave information on the tax status of the clients according to U.S. tax laws. Based on this, the bank committed to the IRS, depending on the tax status of a U.S. taxable person, to either report directly or through an U.S. depositary  (1099 Reporting) or where necessary to collect and deliver the backup withholding tax.

This fundamental system change with the levying of the U.S. withholding tax caused massive adjustments of client documentation, internal processes and IT-systems at UBS AG and at other QIs worldwide. To be in a position to provide information on the taxation status of clients a QI had to obtain from all clients either a corresponding declaration on an official IRS-form or documentary evidence approved by the IRS and archive it in the client files in an auditable form. The clients are - by way of the pertinent IRS-forms - adverted to the fact that their declarations are made under penalty of perjury in case they are untrue, incorrect or incomplete.

As with other banks worldwide the efforts for the implementation rose significantly in the course of 2000, because 1 January 2001 was set as the date for the QI-system coming into force. The implementation was made difficult by the fact that several questions were never clarified by the IRS or it only did so very late. UBS AG had to receive and make available QI-conforming client documentation not only for U.S. clients (status: 2000) but also had to ensure that the documentation of thousands and thousands of client relationships with non-U.S. persons who held U.S. securities in their accounts, provided information that the client and the Beneficial Owner is a non-U.S. persons according to U.S. tax law.

From an operational point of view requesting QI-compatible client documentation (especially W-9 and W-8BEN Forms signed by the client) as well as (forced-) sales of U.S. securities were reasons for concern for UBS AG. A particular challenge was the great number of domiciliary companies, which held U.S. securities in their accounts. In the year 2000, UBS AG maintained client relationships with approximately 32'000 offshore structures, 15'000 of which kept U.S. securities in their depots. Only a



small part of these structures had a further reference to the USA apart from the fact that they had invested in U.S. securities.

With regards to the numerous natural persons and structures which held U.S. securities as clients of UBS AG in the year 2000, client documentation had to be obtained until the end of that year - respectively after the IRS granted a global grace period in the course of 2001. Additionally, U.S. securities held by non-W-9 clients had to be sold, as far as the QI was entitled to do so contractually. Forced sales were executed regularly, also after 2000, if a client became a U.S. person under U.S. tax law – for example by taking up a domicile in the USA – without signing a Form W-9.

## 6   Results of the investigation and sanctions of the EBK

### 6.1   Incorrect implementation of the Qualified Intermediary Agreement by UBS AG

In the course of its investigation the EBK ascertained that in the clear majority of client relations the U.S. tax status of NAM-clients was stated correctly. The investigation, however, brought to light three overlapping constellations in a very small number of cases compared to the total number of clients of the NAM-business where UBS AG seems to have violated its duties under the QIA.

- Category (1) - Restructuring („Switches"): These cases involve an entity (frequently an offshore domiciliary company) which was interposed between the bank and the natural person who until then was the contractual partner of the bank. The then executives of the NAM-business knew in light of the QIA implementation that UBS AG, as a signatory of the QIA, was not allowed to offer proactive support to clients respectively U.S. beneficial owners, who did not want to disclose their data to the IRS via a form W-9, in their search for possibilities to avoid taxes. Based on the bank's guidelines and in coordination with external U.S. tax advisors and in accordance with the interpretation aids of the Swiss Bankers Association, the client advisors were only allowed to arrange a client's contact with an external advisor (after having been asked by the client). In most of the cases, the client advisors complied with this. But there were – in the overall context a relatively small number of - exceptions, particularly in the case of very wealthy clients. At times, individual client advisors not only referred their clients to selected providers of Non-Flow-Through structures, but also actively advised them beforehand, accompanied them to visit such providers or even arranged to meet the client with the provider in the USA. The directly responsible management of the NAM-Business knew about this, although specialists had made it clear that an active role of the bank in setting up those structures may be interpreted as circumventing the QIA. From a U.S. tax law point of view this category is problematic and may be considered suitable of circumventing the QIA; this is due to the proximity of the period in which the restructuring took place and the QIA was implemented and due to the (real life) relations between the client advisors, the structure and the U.S. persons behind the structure.

- Category (2) „Upgrades": These cases involved already existing structures which – however - needed to be restructured with respect to QIA requirements (for example, a change of corporate



form or interposing of an offshore domicile entity) to qualify as a non-tax-transparent Non-Flow-Through structure. In the year 2002, at the occasion of repatriating client relationships from the Bahamas to Switzerland, Upgrades of such structures were discussed within UBS AG and were allowed in isolated cases without any expressive objections raised by Group Tax.

- Category (3) - "Sham-", "Mere Conduit-", "Nominee-" and "Agent" Situations: In general, U.S. tax law assumes that a Non-Flow-Through structure is the beneficial owner of the assets held within the meaning of U.S. tax law. To qualify in such manner, it was and is required that the corporate legal prerequisites are upheld while managing the company with respect to the decision making process and other prerequisites under corporate law. For example, assets of such a structure may only be distributed or investments may only be made, if a formal resolution of the competent corporate bodies exists. Among individual structured clients (the bank's client is the structure) that held their assets in accounts with UBS AG, these requirements were not complied with thoroughly in such manner that the client advisor considered the beneficial owner as the "actual client" and served him like a "direct client". This led to, *inter alia*, monies being taken out of the company without any respective distribution resolutions of the entity which was the account holder. In these and similar cases (e.g. where structures were used to mask active trading or payment activities), the bank could no longer simply rely on the information by the structure which states it was a Non-Flow-Through structure. Insofar as the bank did not request a new form W-8IMY from the structure and the beneficial owners reported to the IRS using W-9 or W8-BEN, it violated its duties under the QIA.

A few individual client advisors of the NAM-Business and their direct supervisors were responsible for this severe misconduct. In addition, their behaviour was partially expected and partially at least tolerated and not, as would have been their duty, vigorously prevented by those responsible for the NAM-business and their direct supervisor. Thereby, UBS AG violated the requirement for fit- and properness as well as the organizational obligations set out in the Swiss Banking Act, because it assumed incontrollable legal and reputational risks for a long period of time. It was particularly severe that the management of the NAM-business failed to inform the top management of UBS AG timely and comprehensively.

With regard to the clarification of the U.S. tax status, the bank had bestowed a big responsibility upon its client advisors. This not only led to an inherent danger of overstraining, but also brought along a potential for malpractice. Although the bank had trained the client advisors concerning the categorization of client relations, it failed to ensure subsequently, by means of periodical and sample controls which are independent from the management, that client advisors only accepted declarations regarding the U.S. tax status of their clients where this was justified.

> *Text box 4:*   *The QIA and the use of structures in Private Banking*
>
> The use of structures such as trusts, foundations and other domiciliary companies within the framework of a private client relationship corresponds to a legitimate need and is legally permissible pursuant to both U.S. and Swiss law. If the bank's client is not a natural person, nor an unincorporated as-



> sociation, nor a charitable foundation, nor an operative partnership or company, but a non-operating domiciliary company, then the bank needs to ensure that is has identified the beneficial owner/s pursuant the applicable anti-money laundering provisions and that it has inquired about the origin of monies. In principle, a bank does not have to take the tax status of the domiciliary company and of its beneficial owner into consideration. A bank needs to at least be able to exclude, by applying the necessary diligence, that the monies brought forward do not stem from a crime (Sec. 305$^{bis}$ para. 1 Swiss Criminal Code; StGB; SR 311.0), that embargo provisions are not violated or that the acceptance of monies is not connected to otherwise incontrollable legal and reputational risks. Finally, according to Art. 8 of the Agreement on the Swiss Bank's Code of Conduct with regard to the Exercise of Due Diligence (*Vereinbarung über die Sorgfaltspflichten der Bank* (VSB)), banks may not abet to be part of any deception manoeuvres of their clients toward local or foreign authorities, particularly toward tax authorities, by incomplete or otherwise misleading statements.
>
> If bank employees are providing advice themselves or perform certain activities for the client, respectively for the beneficial owner, they are exposed to the danger of getting into the proximity of contributing to a tax violation pursuant to foreign or Swiss law. In light of the requirement for fit- and properness as well as the organizational obligations set out in the Swiss Banking Act, certain constellations are problematic in which an institute, such as UBS AG in this case, takes over contractual duties with respect to the IRS towards domestic or foreign authorities by signing the QIA and subsequently neglecting it.

### 6.2  Partial non-compliance with SEC restrictions

In spring 2002, the bank decided to introduce a new "conservative" business-model (the so-called "Revised Business Model") in the non-W-9 business, whereupon contact with U.S. clients by use of U.S. Jurisdictional Means should no longer be permitted. Instead, already existing clients should be induced to enter into portfolio management agreements with UBS AG. With this measure, UBS AG sought to achieve compliance with the SEC restrictions as well as to avoid the risk of Deemed Sales with respect to U.S tax regulations. UBS AG issued a special country paper in 2004, which was revised in 2007, relating to the SEC restrictions and their impact on the activities of client advisors of the NAM-business, The EBK investigation revealed however that several client advisors of the NAM-business had kept in touch with selected non-W-9 U.S. clients over the years and repeatedly and had thus violated the SEC restrictions. These violations were however not limited to the business with non-W-9 clients. Before UBS Swiss Financial Advisers AG ("UBS SFA AG"), which is registered with the SEC, took over the W-9 clients living in the USA with assets above CHF 500´000- in the beginning of 2005, even W-9 clients were sometimes attended to in violation of SEC restrictions.

The EBK admonished the bank for not having enforced its own business policy and the Revised Business Model with necessary persistency. Thereby, the bank as a global company with a strong presence in the USA exposed itself to substantial legal and reputational risks. The EBK considers this neglect as serious. This especially so, because the bank is present as a financial services provider in the USA and since the unclear legal situation with respect to the application of the Deemed Sales Rules and its application in cases of non-observance of the SEC restrictions could not be excluded. The EBK



acknowledged that UBS AG tried to adjust its internal regulations and its business model pursuant to applicable U.S. restrictions continuously. At the same time, the EBK determined that independent compliance controls of the directives for the cross-border provision of financial services into the USA were only established in 2006. The EBK considers this as insufficient in light of the risks inherent to this business.

### 6.3   Increasingly difficult offshore Private Banking of UBS AG for U.S. clients

The responsible managers of the NAM-business had been aware early that classic Private Banking, which is - *inter alia* - based on intensive contact between client advisors and clients, could only be conducted with maximum difficulties in the corset of the duties of a QI in connection with the restrictive SEC restrictions. The acquisition of PaineWebber redounded furthermore to the fact that UBS AG ran increased reputational risks with its parallel offshore business. Hence, the management of UBS AG tightened the general framework for cross-border Private Banking into the USA increasingly. This happened for instance in the year 2002 when it established the Revised Business Model for the non-W-9 business, generally centralized U.S. clients, founded a separate unit for W-9-clients (the UBS SFA AG) and decreed clear directives pursuant to a country paper USA as well as annotations for the QIA.

In its day-to-day business, UBS AG ran politics of strict compliance. However, it neglected to safeguard, via independent controls from direct management that the restrictions were adhered to unexceptionally on the client front. The way the NAM-business had been set up, left the impression with some client advisors of the NAM desks that even though one had to act carefully, a violation of SEC restrictions would be tolerated by their supervisors, as long as this would be unavoidable with respect to the sophisticated demands of wealthy clients. In addition, client advisors of NAM were confronted by two, in their incentives opposing changes of the general framework of the U.S. offshore Private Banking since the year 2004: On the one hand, the country paper USA (2004) had been uploaded to the intranet of UBS AG. This paper gave precise information about what was allowed in the cross-border business and what was not. Client advisors were also trained with respect to the country paper. On the other hand, the performance monitoring- and assessment system of the entire bank was changed and was set up within the Business Unit "Americas" in a special kind of way. In doing this, the criterion of net new money  became the most important factor for the participation in the bonus pool; this had huge implications on the NAM-business which was in the same time confronted with sensitive restrictions and eventually resulted in an ultimate perversion of the targets set by the bank with its performance monitoring- and assessment system. Individual client advisors were inclined to the interpretation that – if the bank set such ambitious targets – it could not be very serious about the enforcement of the country paper USA.

Following the foundation of UBS SFA AG, to which W-9 clients had been transferred to in 2005, the responsible persons became increasingly aware of the fact that offshore Private Banking with U.S. clients was very risky; in particular, because further and further tightening of the U.S. regulatory framework had to be expected. Several (sequentially originated) project teams searched for solutions which turned out to be time-consuming. First, considerations of selling the business came to the fore,



including the sale to a third party as well as a management buy-out by the management in charge of the NAM-business. In August 2007, the top management of UBS AG instead decided to shut down the existing business by way of melting it down step–by-step until zero. The implementation of this decision started in November 2007.

### 6.4   Responsibility on management level

The EBK did not find any indications that the bank's top management had any knowledge of violations of duties under the QIA. In particular, the EBK did not find any indications in the course of its extensive investigation that would lead to the conclusion that top management were accessories or accomplices regarding the violations of the QIA or that management had even proactively furthered such violations. Quite to the contrary, UBS AG undertook great efforts between 2001 and 2002 to ensure that it meets its obligations under the QIA in its entirety. With respect to the QI-documentation of client relationships, which had been a fundamental obligation under the QIA, the former CEO of WM&BB stated unmistakably that "non-compliance is not an option". In view of the then imminent QI-audit and the banking statutory audit Raoul Weil, at that time Head of Private Banking International, pointed out at a meeting of the upper managers of his business unit that there would be "zero tolerance" for non-compliance.

The fact that individual client advisers of the bank had assisted individual clients with their endeavour to avoid taxes while continuing to invest in U.S securities at the same time, was known to a few client advisers, the (few) managers of the NAM-business and its direct supervisor as well as certain experts of GWM&BB. Especially because of this fact and because the bank assumed it had implemented the QIA correctly – even the external auditors had confirmed this when carrying out the audit routine required by the IRS -, it had not established effective controls independent of the line reporting. This caused the now detected partial non-compliance with the obligations deriving from the QIA and the legal and reputational risks accumulated by the bank to have remained undetected by the bank for a longer time.

It was pointed out within the bank that with regards to the compliance with the SEC restrictions heightened reputational risks existed after the acquisition of PaineWeber as onshore and offshore business were operated at the same time. UBS AG, respectively its top management, basically reacted with two (proper) measures to that challenge: Firstly, by adopting the Revised Business Model for the non-W-9 business in the year 2002, and secondly, by establishing an SEC-registered provider for the W-9 business. UBS SFA AG finally took up its business operations in January 2005. Looking back, the EBK is of the opinion that whereas the Revised Business Model was not implemented with the necessary force, the setting up of UBS SFA AG took too long. These weaknesses in leadership cannot be blamed on persons who are to ensure fit- and properness ("Gewährsträger") currently in charge at the bank in a way that would justify imposing supervisory measures against these persons. Rather, these failures have to be attributed to the bank as a whole, as a complex company.



The EBK also considers the fact very problematic that the management of "Americas International" had established a new incentive system from 2004 onwards, in which the criterion of net new money became a paramount factor for the distribution of the bonus pool. This apparently resulted in several client advisors of the NAM-business feeling under additional pressure to reach these goals while accepting the violation of the requirements of the Country Paper USA. Thus, to some extent there has been communication using U.S. Jurisdictional Means with U.S clients contrary to internal directives and also contrary to the SEC restrictions.

Overall, UBS AG lacked the unconditional will to comprehensively adjust itself to U.S. regulatory requirements at all times. The mandatory duty of taking foreign provisions into consideration does not directly result from Swiss supervisory law. It should also be noted that the applicable regulations of U.S. law are blurred at times and are alien to Swiss (supervisory) law. Nevertheless, with respect to the significant exposure of UBS AG in the USA, the adherence to U.S. law is an absolute must from a risk management perspective. Although this point of view was also clearly shared by the top management, it was not implemented dutifully and consistently by its cadres with respect to the NAM-business.

The fact that UBS AG is exposed to existence-threatening, legal and reputational risks emanating from Private Banking can - in the EBK's view - also be attributed to a cultural problem.

### 6.5   Sanctions

The EBK admonished the bank for severe violation of the warranty and organisational requirements and barred it from carrying on its business with U.S. clients out of Switzerland beyond UBS SFA AG. Furthermore, it instructed the bank to adequately capture, limit and supervise the legal and reputational risks with respect to the provision of cross-border financial services out of Switzerland. In contrast, the EBK did not impose any sanctions on former or current executives or employees of UBS AG. UBS AG has not appealed the injunction of 21 December 2008.