# EXHIBIT C



# Transparency report to the shareholders of UBS AG

**Financial market crisis, cross-border wealth management business, liability issues and internal reviews**

# Dear Shareholders,
# Dear Readers,

A number of recent events have given rise to heightened public interest in the inner workings of UBS – the enormous losses incurred in connection with the global financial crisis, legal disputes with US authorities, and the rescue efforts undertaken by the Swiss Confederation and the Swiss National Bank. Above all, the fact that the Swiss government was obliged to step in as an interim shareholder in UBS has given rise to public demands for clarification as to what actually took place inside the bank. Voices have also been raised calling for the responsible persons to be held to account. The Board of Directors fully agrees that transparency is essential if UBS is to regain public trust.

In their report of 30 May 2010, the Control Committees of Switzerland's Federal Parliament requested that UBS undertake specific steps to assess the manner in which the financial market crisis and issues relating to the bank's cross-border business in the US were dealt with internally. UBS was further asked to explain in terms that would be comprehensible also to the general public its decision to refrain from prosecuting criminal and civil claims against former members of UBS's senior management. Finally, UBS was advised to inform the public as to its principal findings and conclusions.

This transparency report is our response to the Parliamentary Control Committees' recommendations to UBS, which were seconded by the Swiss Federal Council, the Swiss government's highest executive body. The report provides a full description of the circumstances inside UBS that were behind the financial losses and legal disputes of recent years, the lessons that the bank has learned from these experiences, and the measures taken both to remedy the situation and to prevent its recurrence. We also explain the reasons behind the UBS Board of Directors' decision not to take legal action against the bank's former directors and officers. We are convinced that the investigations conducted both by UBS itself and by various regulatory authorities have succeeded in shedding full light on the internal causes that gave rise to the serious predicament in which the bank found itself. This report completes the process of achieving full transparency. It has been written with a view to responding to the need of all those with a stake in UBS's future to understand what took place.

**Negative public opinion**

Prior to the crisis, UBS had a reputation as a successful and prudently managed bank. Many Swiss citizens may even have taken pride in the fact that a company with such high global prestige, and so seemingly solid, had its headquarters and its roots in Switzerland. In the aftermath of the financial market crisis it was revealed, however, that UBS had taken a serious turn in the wrong direction under the leadership of the senior management then in charge of the bank. The result was an enormous loss of trust.

We appreciate the fact that many people were deeply dismayed at these events. We also understand fully the questions that have been raised in public: Who is responsible for the bank's losses and for its inappropriate conduct in the US? Should the responsible persons be punished and, to the extent possible, compelled to make good the damage that was caused? How was it even possible that such a seemingly successful company could find itself in such a situation? Is the present Board of Directors attempting to whitewash the acts and omissions of the persons to blame by not taking legal action against them?

These questions are all the more justified in view of the Swiss Confederation's having used taxpayer money to provide UBS with capital and the Swiss National Bank's having been compelled to assume some of UBS's risk positions. The fact that the Swiss Confederation has, in the interim, been able to sell its UBS holdings with a respectable profit and that the Swiss National Bank may well come out a winner on the positions it acquired, changes nothing in this regard. The Swiss Parliamentary Control Committees and a delegation of the Federal Council have also made clear that they expect UBS to bring clarity to these questions.

**Confronting the past**

In 2009, a substantially recomposed Board of Directors, together with a new Group Executive Board, took on the challenge of restructuring UBS and putting it back on the path to sustainable success. As we carry out this endeavor, our focus is squarely on the future, using the lessons of the past to confront the complex economic and regulatory environment that will shape the years to come. With this in mind, coming to terms with its recent past was clearly also in the company's own best interest.

In reviewing the issues and preparing our decisions, we have relied on comprehensive investigations conducted by the bank itself, on legal opinions prepared by outside experts both from Switzerland and abroad, and on the investigations conducted and reports issued by the regulatory authorities. The cost of these extensive internal and external investigations ran into the hundreds of millions of Swiss francs. They have been documented by dozens of reports comprising thousands and thousands of pages. The lessons we have learned from these intensive efforts have been, and will continue to be, put into practice both in the bank's overall strategy and its day-to-day business operations.

The internal and external investigations also provided the Board of Directors with important insights concerning questions of liability. The Board's decision to refrain from taking legal action is based on solid grounds. First, as this report shows, the likelihood of success in such litigation is highly uncertain. Second, experience shows that such proceedings generally go on for years, entailing horrendous costs and giving rise again and again to damaging headlines that render the task of rebuilding trust even more difficult – particularly if the final outcome is less than successful. Moreover, lawsuits against individuals are of no help in getting to the bottom of the underlying causes of a crisis. Such litigation would paralyze many of the bank's resources and

## Contacts

**Investor Relations**
Hotline Zurich +41-44-234 4100
Hotline New York +1-212-882 5734

UBS AG, Investor Relations
P.O. Box, CH-8098 Zurich, Switzerland

sh-investorrelations@ubs.com
www.ubs.com/investors

**Media Relations**
Zurich +41-44-234 8500
mediarelations@ubs.com

London +44-20-7567 4714
ubs-media-relations@ubs.com

New York +1-212-882 5857
mediarelations-ny@ubs.com

Hong Kong +852-2971 8200
sh-mediarelations-ap@ubs.com

**Shareholder Services**
Hotline +41-44-235 6202
Fax (Zurich) +41-44-235 3154

UBS AG, Shareholder Services
P.O. Box, CH-8098 Zurich, Switzerland

sh-shareholder-services@ubs.com

## Imprint

Publisher: UBS AG, Zurich and Basel, Switzerland
Language: English and German
SAP-No. 83436E

© UBS 2010. The key symbol and UBS are among the registered
and unregistered trademarks of UBS. All rights reserved.

Printed in Switzerland on chlorine-free paper with mineral
oil-reduced inks. Paper production from socially responsible
and ecologically sound forestry practices.





hinder it in orientating itself toward the future. Finally – and this was a consideration that weighed particularly strongly – such proceedings would significantly weaken the position of UBS in legal proceedings currently pending in the US. Taking on such financial risks in the name of UBS would be highly irresponsible.

For these reasons, the Board of Directors considers that bringing litigation against former directors and officers of the bank is not an option. This must be stated unequivocally. The Board of Directors believes that it has no discretion in this matter: not to take legal action is the only possible decision in this matter that is compatible with the Board's duties to UBS and its shareholders – even if sections of the public may think otherwise.

**Transparency**

This report sets forth the reasons behind the Board of Director's decision with regard to litigation against the bank's former leadership. We are convinced that this report provides all of the relevant information on the issue and satisfies the need of all stakeholders for full and total transparency.

In order to provide both the public and shareholders with an independent second opinion, we have commissioned a report from Prof. Dr. Peter Forstmoser, an authority in the field of company law. Prof. Forstmoser independently assessed whether the decisions taken by the Board of Directors are, in fact, tenable.

In addition, we believe that both UBS's shareholders and its top management are entitled to an independent assessment of the reasons that led to a company as reputable as UBS becoming so mired in difficulties. In this connection, it is important to evaluate UBS's strategy and actions in the context of both the general economic environment in the period leading up to the global financial crisis and of the behavior of other financial institutions. This assessment has been undertaken by Dr. Tobias Straumann, Lecturer at the University of Zurich, a specialist in the history of financial markets. Dr. Straumann, as well, enjoyed full independence in the preparation of his report.

**Responsibility**

What happened should not have happened. The present report sheds light on the inappropriate behavior and failings that made it possible. Notwithstanding our decision to refrain from taking legal action, we have no wish to gloss over the mistakes that were made, nor do we desire to discharge the persons in charge from their entrepreneurial responsibility. All those who stood at the helm of UBS at the time in question must face up to the moral responsibility they bear, even if the questions of criminal or civil liability remain unresolved. Many of those who led UBS at the time have already acknowledged this responsibility toward the company, either by waiving certain compensation claims or by repaying amounts received.

**Switzerland as a headquarters for globally active businesses**

Switzerland, although a small country, has attained a higher than average level of prosperity. This is a product not only of the

proficiency of Switzerland's business professionals, but also of the country's outstanding environment for doing business. The creation of this environment is the accomplishment of our political institutions.

Because of this favorable business environment, UBS and its predecessor banks were able to develop, over a period of many years, into a company of great significance for the entire Swiss economy and its financial industry. This is the expression of an important reciprocal relationship: high-performance companies contribute to Switzerland's prosperity, and a favorable regulatory environment for business provides high-performance companies with the support base they require. The UBS Board of Directors is acutely aware that Swiss companies benefit to a high degree from being domiciled in Switzerland, and hence also bear a responsibility toward the country. When a large corporate group of global dimensions stumbles, this harms not only its own reputation, but also that of the place in which it is domiciled. The experience of UBS is a case in point.

The principal reason for our decision to refrain from taking legal action against the persons formerly in positions of responsibility in the group was to protect the bank's own best interest. Nevertheless, the Board of Directors is also cognizant of its responsibility toward the country in which it is headquartered. For this reason, among others, UBS has systematically and unflinchingly drawn the necessary conclusions from its past mistakes. UBS has undertaken to establish a corporate culture that precludes any conduct that could cause harm either to the company or to the country it calls home, Switzerland. Similarly, we are convinced that refraining from litigation is very much in the long-term interests of Switzerland as an international business location. For UBS to take on the considerable risks involved in litigation, preventing it from resuming normal business operations for years to come, would be of benefit to no one.

**Acknowledgements**

The Board of Directors and the Group Executive Board owe a large debt of gratitude to the Swiss Parliament, the Federal Council, the Federal Administration and the Swiss National Bank. Our particular thanks go also to the shareholders and clients who have remained loyal to UBS in difficult times, and to all our employees, who have demonstrated their full commitment under demanding conditions.

UBS should never again find itself in a comparable position. Today, UBS is financially stable. We will do our best to ensure that it performs its services for Switzerland and the Swiss economy, and for the other countries in which it does business, responsibly, and in keeping with the highest standards of quality. Until we have achieved this for all to see, we will not rest.

Zurich, in October 2010

Kaspar Villiger
Chairman of the Board of Directors

# Contents

**4  I. Overview**

**15  II. The financial market crisis**
**16  A. What led to UBS's losses during the financial market crisis?**
16  1. Financial products in the US real estate market
17  2. UBS's exposure to the US real estate market
18  3. Outbreak of the crisis
19  4. Measures taken by UBS to strengthen its capital base
**20  B. How did UBS review the crisis?**
20  1. UBS investigations
21  2. Business areas affected by losses
22  3. How was it possible for the losses to occur?
**24  C. How did the supervisory authorities deal with the crisis?**
24  1. Investigation by the Swiss Federal Banking Commission
25  2. Investigation by the SIX Swiss Exchange
25  3. Investigations by foreign supervisory authorities
**26  D. What measures has UBS taken to ensure that such losses do not recur?**
26  1. UBS action plan
27  2. Strategy
27  3. Governance
27  4. Risk management
28  5. Risk control and financial aspects
28  6. Funding and treasury management
29  7. Remuneration

**31  III. US cross-border wealth management business**
**32  A. How did the issues with the US authorities arise?**
32  1. UBS's cross-border wealth management business
32  2. Legal framework
33  3. UBS's US cross-border business between 2000 and 2007
34  4. Contact by the US authorities
**35  B. How did UBS handle the situation?**
35  1. Investigation by Wachtell, Lipton, Rosen & Katz
37  2. Internal disciplinary investigation by UBS
37  3. Why did the problems in the US cross-border wealth management business occur?
**38  C. How did the supervisory authorities react to the events?**
38  1. Investigation by the Swiss Federal Banking Commission
40  2. Investigations by the US authorities
**43  D. What steps has UBS taken to ensure that the problems do not recur?**
43  1. Exit from the US cross-border business/US Settlement Execution Program
44  2. Comprehensive measures to address and control risks associated with the Wealth Management & Swiss Bank cross-border business globally/Cross-Border Business Review Program
46  3. Changes to the governance of Legal & Compliance
47  4. Improvement of governance and of the control program relating to the implementation of the QI Agreement

**49  IV. Liability issues**
**51  A. Claims under civil law against former directors and officers**
51  1. Preconditions for a director's liability claim under civil law
52  2. Investigations commissioned by UBS
53  3. Liability claims in connection with the financial market crisis
53  4. Liability claims in connection with the US cross-border management business
54  5. Further considerations by the Board of Directors
**56  B. Steps against the former directors and officers of UBS under criminal law**
56  1. Expert report by Bär & Karrer
56  2. Assessment by the public prosecutor's office of the canton of Zurich
57  3. Assessment of the Board of Directors
**58  C. Decision by the Board of Directors**

**59  V. Where does UBS stand today?**
**60  A. Need for a new corporate culture**
**61  B. Outlook**

**65  Glossary**

Case 0:08-cr-60322-JIC   Document 52-1   Entered on FLSD Docket 06/20/2014   Page 7 of 22

# I. Overview

From the middle of 2007 until the end of 2009, UBS AG (UBS) experienced the most serious crisis in its corporate history. It was able to overcome this turbulent period thanks, in particular, to the support of the Swiss Confederation and its authorities: In the fall of 2008, the Swiss National Bank (SNB) undertook to acquire securities held by UBS in an amount of up to 60 billion US dollars to relieve UBS's balance sheet. By the spring of 2009, the SNB StabFund, a special purpose vehicle established by the SNB, had acquired such securities in the total amount of 39.6 billion dollars. At the same time, UBS received a capital injection of 6 billion Swiss francs from the Swiss Confederation. The Swiss authorities decided to support UBS with these measures with a view to UBS's systemic relevance to the Swiss financial center and the economy in general. Official diplomatic efforts were required in order to help resolve conflicts with the US authorities in the context of the cross-border wealth management business.

Today, in October 2010, UBS is once again healthy and robust. In the fourth quarter of 2009, it returned to profitability, its equity position is solid and, compared to the situation at the outbreak of the financial market crisis, its balance sheet total and risks have been reduced by some 50 percent. In summer 2009, the Swiss Confederation was able to sell the UBS shares it had received in connection with the capital injection at a profit. By the end of June 2010, the SNB StabFund's total exposure had been reduced to 19.2 billion dollars.

As positive as these recent developments may be, however, they cannot obscure the seriousness of the situation into which UBS managed to bring itself during the crisis. Rather, the question arises how the financial market crisis could cause such huge losses for the bank and how UBS could have maneuvered itself into such a difficult position in connection with the US cross-border wealth management business. As discussed in this report, internal factors, primarily organizational shortcomings and the lack of adequate controls inside the bank led to UBS suffering substantial losses in connection with the subprime crisis. The problems UBS faced in connection with its cross-border wealth management operations resulted in part from the insufficient enforcement and the lack of adequate control of internal regulations, and in part from a corporate culture that did not address violations of regulations by individual employees vigorously enough. Although not directly related to each other, both issues materialized simultaneously, causing a serious loss of reputation and confidence in the bank.

What has transpired since the middle of 2007? How could these serious problems occur, and what has been done since that time? By publishing this report, it is UBS's intention to create the transparency required to faithfully answer all relevant questions.

**Creating transparency**

From March 2009 to the end of May 2010, the Control Committees of the Federal Assembly (CCs) conducted an extensive

investigation into the conduct of the Swiss authorities under the pressure of the financial market crisis and into the surrender of UBS client data to the US by Swiss authorities. The CCs' report of 30 May 2010 includes, among others, 19 recommendations to the Federal Council for further action. Recommendation 19 is addressed directly to UBS and essentially requests the following:

– UBS shall ensure that the handling of the subprime crisis by the bank and its US cross-border business are investigated;
– the UBS Board of Directors shall create transparency with respect to the decision not to take criminal or civil legal action against former UBS management; and
– UBS shall inform the public of the essential findings and conclusions.

This report represents UBS's response to Recommendation 19 of the CCs and creates transparency with respect to the developments that occurred in recent years, the internal and external investigations that were conducted, and the measures implemented by UBS. Further, the UBS Board of Directors explains in this report to shareholders and the interested public its decision not to take legal action against former directors and officers.

This report has been prepared pursuant to instructions by the Board of Directors. In addition, the Board appointed two independent experts each with the mandate to prepare separate expert opinions.

– The first of these experts, Prof. Peter Forstmoser, professor emeritus at the University of Zurich and an authority in the field of corporate law, assessed the question of directors' liability under corporate law. Prof. Forstmoser specifically examined whether the decision of the Board of Directors not to take legal action against former members of management is defensible and whether the Board had at its disposal sufficient information on which to base such a decision.
– The second expert, Dr. Tobias Straumann, a private lecturer at the University of Zurich and economic historian specializing in financial markets, investigated the causes of the financial market crisis and of UBS's problems with its cross-border wealth management business in the US from an economic, historical and political perspective. Dr. Straumann also has extensive experience in analyzing international financial history and European monetary and economic policy. In his analysis, he considers the question of why UBS was particularly hard hit by the subprime crisis and what caused the undesirable developments in the cross-border wealth management business.

Both of the independent experts had access to all relevant documents, in particular to all internal and external investigation reports and expert opinions referred to in this transparency report. They received no instructions or other conditions from UBS with respect to the scope or content of their work or the conclusions to be reached.

### The financial market crisis

#### Developments

Between the third quarter of 2007 and the fourth quarter of 2009, UBS wrote down more than 50 billion francs. Most of these write-downs had to be made as a result of the global financial market crisis, which had its origins in the structured financial product business linked to the US residential real estate market.

Such financial products, which reflect the risks of the underlying mortgage loans, had been able to satisfy increasing demand from investors prior to the crisis, but had also become more and more complex over time. Financial institutions such as UBS were involved at various levels of the market and also carried such products on their own balance sheets. Triggered by an unexpectedly severe and swift collapse of prices in the US real estate market, the simultaneous occurrence of a number of extraordinary factors caused the market for these products to dry up within a very brief period of time, beginning in July 2007. The sharpness of the decline in the US market for structured financial products came as a surprise to most market participants, including UBS.

The Group Executive Board of UBS recognized the extent of the possible consequences for the business with securitized products linked to the US housing market only at the end of July 2007, by which time the markets were already under pressure. The chairman and the two full-time vice-chairmen of the Board of Directors of UBS (the so-called "Chairman's Office") and the Group Executive Board were informed as to the extent of the problems on 6 August 2007.

On 14 August 2007, UBS issued a market warning with regard to problems related to the impending crisis. On 1 October 2007, it reported on the write-downs that it had made in the third quarter, and on 10 December 2007 it announced a number of capital restructuring measures, including the issuance of a 13 billion franc mandatory convertible bond to one of the Singapore government's sovereign wealth funds and to an investor in the Middle East. This and two other measures, such as the sale of treasury shares and the payment of a stock dividend rather than a cash dividend, enabled UBS to increase its overall equity base by a total of 19.4 billion francs.

Further write-downs in the first half of 2008 made another capital increase necessary: on 1 April 2008, UBS approached its shareholders and in June 2008 was able to raise approximately 15 billion francs in additional funds through a public capital increase. This, however, was not yet the end of the crisis.

The financial market crisis reached its peak after the collapse of the US investment bank Lehman Brothers in September 2008. Central banks worldwide were compelled to provide massive liquidity injections to ensure the continued operation of the credit business in the interbank system, and a number of governments, including those of the US, Great Britain and Germany, ordered state capital contributions to banks for which they were directly responsible. Switzerland also provided funds to the banking system.

On 16 October 2008, UBS reached an agreement with the SNB to transfer part of its US and other securities to a special purpose vehicle formed by the SNB under the name SNB Stab-Fund. UBS contributed to the equity of this special purpose vehicle an amount corresponding to 10 percent of the value of the transferred positions, combined with the option to repurchase these positions. To fund the equity contribution, and maintain at the same time the strong capital position of UBS, the Swiss Confederation subscribed mandatory convertible notes in the amount of 6 billion francs. In addition, it announced that it was prepared to guarantee new short- and medium-term interbank liabilities as well as money market transactions of Swiss banks, if required. From the fall of 2008 through the spring of 2009, securities totaling 39.6 billion dollars were transferred to the special purpose vehicle.

The International Monetary Fund estimates that by April 2010, banks worldwide had to write down approximately 2,300 billion dollars during the course of the financial market crisis. Hardest hit were the US banks Citibank and Merrill Lynch; however, UBS ranked third worldwide for highest total losses incurred and first among the banks in Europe.

#### Review of the events

Following the outbreak of the financial market crisis and its first losses, UBS began to investigate the causes that had led to these developments. The supervisory authorities closely followed UBS in the internal investigations conducted in this context. An internal UBS investigation, the results of which were published in summary form in April 2008, identified a number of institutional weaknesses that had caused UBS to be more strongly hit by the crisis than others:

– *Growth strategy:* In the summer of 2005, UBS had spun off a significant portion of its business in fixed income investment products into its subsidiary Dillon Read Capital Management (DRCM). At the end of 2005, the decision was made to develop, in parallel to DRCM, the same type of business inside the UBS Investment Bank, since UBS hoped to become one of the top banks in the world in this sector as well. First, however, the required resources had to be put in place, as many specialists in the meantime had joined DRCM. In retrospect, the growth strategy had not been planned systematically enough and it had been implemented without sufficient monitoring.

   As a result, the growth strategy led to a situation in which both DRCM and UBS Investment Bank were investing in similar categories of investment products. Because DRCM was invested, inter alia, in products with low credit ratings, while UBS invested primarily in products assumed to be of high quality, too little attention was paid to the risk of a simultaneous collapse in the prices for all investment products.

– *No balance sheet limits:* Prior to the financial market crisis, the bank had not set any limits for its balance sheet total. Together with the other causes described herein, this made it possible to accumulate enormous holdings in US mortgage securities, the consequences of which were devastating when that business began to fall apart.

– *Low refinancing rates:* Up until the outbreak of the financial market crisis, it was not a problem for UBS to obtain credit and capital market funding at favorable terms. The short-term funding obtained from the markets could be made available within the bank at no additional risk premium,

5

irrespective of the risks that the individual business units planned to assume. The Investment Bank was thus able to make investments in the ostensibly safe US mortgage market while obtaining funding at very favorable terms. This strategy imploded when credit markets dried up in the financial market crisis, since the market conditions no longer allowed UBS to refinance on favorable terms.

– *False sense of security despite warning signs:* Toward the end of 2006, that is, less than one year prior to the outbreak of the financial market crisis, it became apparent that the growth in the US real estate market might be turning into a speculative bubble.

In spite of these signs, up until July 2007, the management of UBS Investment Bank was confident. It falsely believed, on the one hand, that its investments in mostly high-quality investment products with high credit ratings and presumably adequate downside protection were, in fact, safe. Based on the presumed high quality of the underlying securities, these products were rated AAA or AA, sometimes even higher as so-called super senior. Insofar as UBS was involved, on the other hand, in the purchase, bundling and resale of structured financial products, it believed that the holdings of investment products held in its "warehouse" could be sold at any time in the market. Because of these assumptions, which in retrospect turned out to be incorrect, UBS neglected to take additional measures to limit its risks in the US housing market.

– *No overall assessment of risk positions:* The management of UBS Investment Bank was aware of the individual positions held by business units that invested in US mortgage products or bundled and resold them. There was, however, no overall assessment of the entirety of the bank's credit and default risks associated therewith.

– *Reliance on information from business units:* Up until the end of July 2007, the UBS Group Executive Board relied on the statements of the responsible heads of the business units to the effect that risk management and risk control were being performed correctly in the US mortgage market. It was not until the end of July 2007 that the management of the Investment Bank became fully aware of the risk positions. The Chairman's Office of the Board of Directors and the Group Executive Board were informed of these developments on 6 August 2007.

– *Overreliance on statistical models:* In hindsight, it is clear that UBS specialists in the risk control area placed too much trust in statistical models. The bank also relied too heavily on the rating agencies and the ratings they issued for certain investment products. This model-based approach, which furthermore relied heavily on the assessment made by the rating agencies, ultimately shifted attention from the fundamental risks underlying the US housing market.

– *Remuneration:* The remuneration models used prior to the financial market crisis did not distinguish sufficiently between real added value created by above-average performance and income generated by exploiting market advantages, such as low funding costs. The incentive structure encouraged the generation of revenues without adequately considering the associated risks.

The supervisory authorities – in particular the former Swiss Federal Banking Commission (SFBC; today the Swiss Financial Market Supervisory Authority, FINMA) – conducted independent investigations. These were completed in September 2008 and publicly announced in mid-October 2008. In its overall assessment, the SFBC stated that it agreed with UBS's analysis with respect to the shortcomings that had been identified. The SFBC stated further that UBS had inadequately identified, limited and monitored its subprime risks. This finding related in general to UBS's governance, operational and control processes as a whole, although to differing degrees. The SFBC reached the conclusion that not all of the shortcomings listed, considered individually, were indicative of inadequate organization, poor management or deficient governance. The essential point, however, was the unsatisfactory result they produced in combination.

In summary, the SFBC noted that UBS as a whole, in its dealings in subprime securities, had failed to demonstrate irreproachable business conduct, as required under banking law, but that the then-responsible executives of the bank could not be held liable under supervisory law. As the SFBC, pursuant to long-standing and confirmed practice, does not review the fit and proper status of executives who have left their position, the same question did not come up in respect to directors and officers who already had resigned. The SFBC further noted that its investigation revealed no information that would suggest that UBS managers had deliberately intended to cause damage to the bank, or had deliberately assumed incalculable risks solely for the sake of receiving higher bonuses. There was also no indication that the individuals responsible for risk control had, in fact, been aware of the risks that were assumed but had willfully turned a blind eye to them.

UBS shares the assessments resulting from this investigation. Since 2008, and in part still under its former leadership, UBS has taken a series of measures, of which the major part has already been implemented. These measures are aimed at substantially strengthening risk control processes, thereby preventing a recurrence of the losses suffered in the financial market crisis. They include the following:

– *Strategy:* The overall strategy of the bank was adjusted to focus on business transactions carried out on the basis of client instructions. At the same time, proprietary trading and the resulting risks were reduced. As an additional immediate measure, the CEO of the Investment Bank reviewed the portfolios of each business area in 2008. The Group Executive Board, together with the CEO of the Investment Bank, now ensures that periodic reviews are carried out at all levels, in order to ensure that there is a comprehensive risk assessment.

– *Corporate governance:* Since the beginning of the financial market crisis, UBS has fundamentally recomposed the Board of Directors and Group Executive Board. A significant number of the new members of these boards were recruited from outside the company. The experience they gained in other financial service companies now benefits UBS.

There is now a clear separation of responsibilities between the Board of Directors, on the one hand, and the Group Executive Board on the other. In July 2008, the Chair-

man's Office was abolished and replaced by Board of Directors' committees; at the same time a new Risk Committee was established, consisting exclusively of independent directors. In October 2008, additional new members of the Board of Directors were elected. In the spring of 2009, the Group Executive Board was again recomposed to allow the bank in its entirety a new start.

The Board of Directors bears ultimate responsibility with regard to strategy. It decides on the risk capacity and risk appetite of the group, as well as on the allocation of capital and balance sheet limits among the divisions. The Group Executive Board is directly responsible for implementing the strategy and for allocating the required resources to the business units. It is assessed based on risk-adjusted profit.

– *Risk management:* The recording of positions, their valuation, and the assessment of their risks and effects on the profit and loss account are now regulated on a group-wide basis. The bank introduced procedures to continuously monitor complex products and transactions so that concentrations of risk can be identified at an early stage. Each business unit must be able to explain its balance sheet (including risk positions) and its profit and loss account based on standardized measurements.

Business plans are now assessed based on uniform criteria both at the group level and the level of the individual business units and are regularly scrutinized. Whether set targets can be achieved is reviewed at least four times per year by the CEO and the Group Executive Board. In the framework of reporting, the income and expenses of the individual business units are compared with projections, enabling corporate management to identify and correct undesirable developments early on.

– *Risk control and finance:* Prior to the financial market crisis, specialists, such as those in the area of risk control, often had two superiors – the head of the business unit as line manager and a specialist in the area of risk control; however, structures have now been simplified and harmonized. Each Chief Risk Officer of a business unit has now the Group Chief Risk Officer as the only direct superior, and the risk control function of the group is now independent of the business divisions.

The risk control rules and methods internally applied by the bank have been thoroughly reviewed and improved where necessary. This applies in particular to value-at-risk calculations, stress tests, risk aggregation and the monitoring of valuation and accounting models. The quality and frequency of reporting for the bank's profit and loss statement have also been increased. The harmonized and integrated internal reporting system now provides a "Monthly Performance Update" to all members of the Board of Directors and the Group Executive Board. This report analyzes the bank's business performance and sets out in detail the relevant internal and external risks to which the bank is exposed.

Entering into new businesses (New Business Initiatives) is now subject to more stringent controls and has to be submitted to the Risk Committee of the Board of Directors for approval. Committees have been formed at various levels to examine and approve large and high-risk transactions.

– *Fund-raising and balance sheet management:* The Group Executive Board now also constitutes the Asset and Liability Committee (ALCO) at the group level. The responsible members of this committee are accountable to the Board of Directors for the assigning of balance sheet limits, risk-weighted assets and capital to the individual business units. ALCO also approves internal group financing.

Limits for total balance sheet growth and risk-weighted assets have been introduced both on the group level and in particular at the level of the Investment Bank. Financing costs are now handled on the basis of risk.

– *Remuneration:* The remuneration of the members of the Board of Directors and Group Executive Board was reviewed and amended on the basis of the bank's goal of sustainable performance.

All aspects of individual target setting and performance review of the top managers of the bank have been improved. This was to ensure that managers, when making decisions regarding remuneration, place greater emphasis on sustainable increases in corporate value than was the case prior to the crisis. In addition, the remuneration will be provided increasingly in the form of shares and equity-related instruments.

Finally, UBS has reformed its basic remuneration principles. Contrary to the situation prior to the financial market crisis, variable compensation no longer contains only a bonus component, but in some cases also a malus component. In particular, a malus is recorded if a loss results at the group or division level, or if drastic adjustments to the consolidated balance sheet are required. A malus may also be recorded for individual managers where gross violations of compliance regulations or of risk guidelines are identified. In particularly severe cases, deferred remuneration is forfeited in its entirety.

A detailed explanation of the reasons leading to the losses that UBS suffered during the financial market crisis is provided in Part II.A **(cf. below page 16 ff.)** of this transparency report. Information on the investigations conducted by UBS into the reasons for the losses during the financial market crisis follows in Part II.B **(cf. below page 20 ff.)**. The investigations conducted by domestic and foreign supervisory authorities in this regard are discussed in Part II.C **(cf. below page 24 ff.)**. Finally, Part II.D **(cf. below page 26 ff.)** provides a detailed description of the steps that UBS has undertaken to ensure that the deficiencies that occurred in the past will not recur.

## Cross-border wealth management business

### Developments
UBS serves a large number of its clients via branch offices in their countries of residence. This business is referred to as "onshore business". Other clients have an account with a UBS branch office or with a subsidiary of UBS outside their country of residence. This business is referred to as "offshore" or "cross-border" business. Cross-border business was and is an important line of business for UBS and many other banks, especially Swiss banks active in the area of international investment advi-

sory services and wealth management. When performing its cross-border business from Switzerland for US clients, UBS had to observe both Swiss law and the law of the country where the clients were located, that is, US law.

Many offshore clients choose to establish banking relationships with Swiss banks due to the political stability of the country and the high quality of services provided in the banking industry. For reasons of personal confidentiality, other clients place special value on the Swiss banking system and the bank-client confidentiality provided for in the Banking Act. Certain clients were also concerned with avoiding taxes in their country of residence. This was the root of the problem that led to the disputes between UBS and the US authorities.

In the late 1990s, the US tax authorities (the "Internal Revenue Service", or "IRS") revised the existing US withholding tax system in many respects and introduced the so-called "Qualified Intermediary System (QI System)". The intention of the IRS under the QI System was to ensure that income derived by non-US taxpayers from US securities would be subject to the proper withholding tax rates according to the applicable double taxation treaties (DTT). Further, the intention was that US taxpayers properly report and pay taxes on income generated from US securities held through non-US financial institutions.

The QI System is based on an agreement (the "Qualified Intermediary Agreement" or "QI Agreement") which foreign banks can conclude with the IRS. For non-US financial institutions subject to the QI Agreement the following applies: their clients who are US taxpayers can only hold their securities accounts under the scope of financial privacy in Switzerland if they do not invest in US securities through such accounts. Clients who are US taxpayers subject to US taxes and who wish to invest in US securities must submit to the foreign financial institution a so-called IRS Form W-9 that results in the disclosure of the client's account to the IRS. The banks are also obliged to perform certain administrative tasks for the IRS necessary for the correct application of the withholding tax rates to income generated from US securities held by non-US taxpayers pursuant to the applicable DTTs, in particular the identification of the beneficial owners of the US securities.

The QI Agreement between the IRS and UBS entered into force on 1 January 2001. UBS implemented the agreement and the necessary organizational measures in a timely manner, which required enormous efforts. As it later transpired, implementation at UBS was deficient, and, in a number of cases, the internal guidelines issued by the bank in connection with the QI Agreement were ignored. Insufficient controls led to these incidents being detected and sanctioned only at a much later date.

In addition to the provisions of the QI Agreement, UBS also had to comply with restrictions imposed by US financial market supervisory laws. Providing investment advice, wealth management or security trading services in the US is subject to a licensing requirement. The license requirement also applies to the cross-border business, in particular when clients are in the US, irrespective of whether they are contacted in person or by telephone, fax, post or e-mail. Prior to 2005, UBS was not licensed in the US for its cross-border wealth management business and was therefore subject to the restrictions resulting from the license requirement (SEC Restrictions). Before obtaining a

license, UBS was not permitted, for example, to accept orders for the purchase or sale of shares on US territory or to provide investment advice to its clients in the US. As the investigations revealed, certain client advisors in a number of cases ignored the SEC Restrictions, in violation of internal guidelines.

In September 2007, the US Department of Justice (DoJ) and later the US Securities Exchange Commission (SEC) informed UBS that they had opened investigations into the bank's activities after being made aware by Bradley Birkenfeld, a former UBS client advisor, of alleged irregularities in the US cross-border business. Specifically, both authorities asserted that UBS had tolerated, in numerous instances, the violation of SEC Restrictions, and that, in connection with the implementation of the QI Agreement, there had been circumventions with respect to clients subject to US taxation. At the end of February 2008, the DoJ requested that information relating to certain account relationships with US clients in Switzerland, including the clients' identity, be disclosed. The IRS complemented these information requests of the US authorities in June and July 2008 first with a so-called John Doe Summons, and then with a request for administrative assistance submitted to the Swiss Federal Tax Administration (FTA) under the DTT between Switzerland and the US. On 17 July 2008, the Permanent Subcommittee on Investigations of the United States Senate held a public hearing on UBS's US cross-border wealth management business. As from March 2008, UBS sought the assistance of the Swiss government. The investigations subsequently carried out by UBS, the SFBC and the US authorities, and the administrative assistance proceedings carried out by the FTA, proved to be time-consuming. In retrospect, both UBS and the Swiss government did not inform each other sufficiently about the increasing escalation of the matter and they both equally failed to accurately assess the political situation in the US. Only relatively late in the process was a committee of the Board of Directors mandated to closely supervise the handling and resolution of the matter. The investigations carried out by UBS, the SFBC and the US authorities ultimately established that, from 2001 through 2007, UBS and its employees had breached obligations under the QI Agreement and the SEC Restrictions, and that the bank had failed to sufficiently control compliance with these restrictions and obligations.

Upon conclusion of the investigations by UBS and the SFBC, UBS and the US authorities started negotiations regarding a potential settlement. The negotiations with the DoJ proved to be very difficult. The US authorities, among others, took the position that the conclusion of a settlement would only be possible if there was a simultaneous delivery of account documents relating to a number of client accounts, either in the course of the ongoing administrative assistance proceedings in tax matters, or otherwise. At the same time, there was a threat of a criminal indictment of the bank and its top corporate bodies. UBS informed the SFBC, its successor authority FINMA and the Federal Council regularly as to the course of these negotiations. In light of the foreseeable conflict between the two jurisdictions, the Swiss authorities took up direct contact with the US authorities beginning in the spring of 2008. On 18 February 2009, UBS was finally able to reach settlements with the DoJ and the SEC. As part of these settlements, UBS agreed to pay a total of

780 million dollars and to complete the exit of the US cross-border business which it had already begun. Further, in view of the threat of a criminal indictment in the US and of its potential effects on the bank, FINMA instructed UBS to hand over to it data concerning certain client relationships, which FINMA then passed on to the DoJ. Despite intensive efforts undertaken towards the end of 2008 and the beginning of 2009, it was not possible to settle the John Doe Summons proceedings with the IRS contemporaneously with the settlements concluded with the DoJ and the SEC.

The negotiations with the IRS concerning the John Doe Summons proceedings continued into the summer of 2009. The IRS had commenced these court proceedings with the objective to forcing UBS to turn over all client data related to UBS accounts maintained by US taxpayers in Switzerland. Switzerland and the US managed to settle these proceedings on the basis of a treaty on 19 August 2009. On the basis of this treaty, the IRS submitted a request for administrative assistance to the Federal Tax Administration based on the existing double taxation agreement between the two countries. The purpose of this request was to obtain information concerning certain UBS accounts maintained by US clients in Switzerland. UBS was ordered to deliver to the Federal Tax Administration information on accounts that were defined in detail in the treaty agreed between Switzerland and the US. In addition, the bank was required to encourage the US clients concerned in writing to make use of an IRS voluntary disclosure program. Many UBS clients took advantage of this opportunity and have now rectified their tax situations.

## Review of events

As of the second half of 2007, a US law firm specializing in this area was mandated to perform an independent investigation of the allegations made by the DoJ and the SEC. This investigation was conducted in continuous consultation with the authorities concerned. This investigation turned out to be the most expensive and comprehensive investigation that UBS had ever commissioned. It examined all potentially relevant aspects of UBS's US cross-border wealth management business with US clients. The SFBC, which was informed about this investigation, carried out its own, independent investigation into these matters.

In conclusion, the following shortcomings had led to the problems with the US authorities:

– *Lack of a comprehensive and continuous risk analysis:* From the year 2000 onwards, UBS had increasingly identified the risks associated with the US cross-border wealth management business, both in connection with the implementation of the QI Agreement and with compliance with the SEC Restrictions. However, with few exceptions the two issues were addressed separately when assessing the risks and taking corresponding measures. The risks resulting from the concurrent operation of both an onshore and an offshore business were not sufficiently appreciated. The consequences of different authorities proceeding jointly in the enforcement of their respective regulations, and the increased regulatory risk profile of UBS due to its US operations, were not adequately assessed or appreciated from an overall, comprehensive perspective. For far too long, too much reliance was placed on

the fact that historically the SEC had not vigorously enforced the SEC Restrictions with respect to the cross-border service of private clients. In addition, UBS failed to implement adequate measures in a timely manner in response to the consequences resulting from the increasing focus that the US authorities placed on the enforcement of their tax regulations, and those resulting from the growing domestic political pressures in the US.

– *Hesitant and incomplete implementation of measures taken:* As the risks, at least in an isolated manner, had been largely recognized, the highest levels of management of UBS had decided to take appropriate measures in order to ensure compliance with the applicable US laws. However, there was repeatedly a lack of sufficient speed and thoroughness when these measures had to be implemented. Such was the case, for example, with the adjustment of the business model in 2002, with the formation of UBS SFA AG, and likewise with the implementation of measures that had been decided upon following the investigation of the whistle blowing by Bradley Birkenfeld. The focus of line management was on the acquisition of new business; insufficient attention was placed on the management of the risks that were simultaneously incurred. Repeatedly, measures that had been decided were enforced only hesitantly and incompletely.

– *Deficiencies in implementation of and compliance with the QI Agreement:* UBS made enormous efforts to implement the QI Agreement, and implemented it in a correct manner to a large extent. However, the client advisors in the US cross-border wealth management business were given too much discretion in their interactions with US clients, and controls were insufficient. This enabled some of the client advisors in a number of cases to assist their clients in efforts to circumvent restrictions relating to the holding of US securities.

– *Insufficient compliance culture and lack of controls:* Full compliance with the complex regulatory framework governing the cross-border wealth management business with clients residing in the US was generally not adequately addressed by UBS. The business was, for example, not effectively monitored and the failures of the employees involved were not consistently detected and corrected. There were also shortcomings in training and guidance, and in the structuring of incentives. The internal guidelines were imprecise and the expectations with regard to compliance therewith were not communicated with the required sense of urgency. This allowed client advisors to gain the impression that a certain degree of non-compliance would be tolerated by line managers, which in part turned out to be the case.

On 23 May 2008, the SFBC opened its own investigation into UBS. This investigation resulted in a 161-page "Report by the SFBC on the Implementation of the Qualified Intermediary Agreement and on Cross-Border Services of UBS in the USA (SFBC Cross-Border Report)". The results and materials from the UBS-commissioned investigation were made available to the SFBC, which further examined the events on its own and commissioned an independent investigator to look into certain issues.

The SFBC noted that UBS had taken great efforts to implement the QI Agreement, and that in most respects it had been correctly implemented, but that weaknesses existed in certain areas. These included inadequacies in the monitoring process, on the one hand, and, on the other, generally insufficient enforcement of compliance with the applicable contractual and statutory provisions – both in the area of the QI Agreement and that of the SEC Restrictions. The fact that the employees responsible for the US cross-border business had been granted too much freedom and that their activities had not been sufficiently monitored was identified by the SFBC as a core problem. Another contributing factor was the introduction of a remuneration model which emphasized the criterion of an increase in new client money – an objective in tension with full compliance with US regulations and the terms of QI Agreement.

The SFBC therefore noted that UBS, when implementing its obligations under the QI Agreement and as a consequence of partially insufficient compliance with the SEC Restrictions, took incalculable legal and reputational risks and that by so doing it had infringed on the principles of both proper business management and of proper organization as set forth in the Banking Act. The fit and proper status under the Banking Act of the former members of the corporate bodies, however, was not put in question. The SFBC ordered UBS to adequately address, limit and supervise the legal and reputational risks resulting from its entire cross-border wealth management business, and further ordered that the measures taken had to be the subject of a control by an independent audit firm.

UBS accepts the assessment that emerged from the SFBC investigation and has accepted the measures imposed by the SFBC in its order dated 21 December 2008. Accordingly, it has decided to take a series of measures for the purpose of ensuring that the problems in the cross-border wealth management business do not recur:

– *Exit from the US cross-border business and comprehensive framework of instructions and controls regarding business relationships affecting the US:* UBS has completed its exit from the cross-border wealth management business with US clients, introduced new processes and monitoring systems, and adjusted the provision of certain services so as to ensure that the bank consistently complies with US law with respect to all transactions with clients with a link to the US.

Over a period of one year, a US law firm, acting as an "independent consultant", with the assistance of the auditing company KPMG, has continuously reviewed the implementation of these measures. This law firm recently confirmed, in a comprehensive report to the SEC and the DoJ, that the measures had been successfully implemented.

– *Improved internal instructions and enhanced controls of the cross-border wealth management business:* Within the framework of extensive projects, UBS has identified all risks in the cross-border businesses of all its business divisions, including the global wealth management business and the Investment Bank, and adopted numerous far-reaching measures to adequately monitor these risks.

In the cross-border wealth management business of the business division Wealth Management & Swiss Bank, new instructions have been issued, and independent monitoring

procedures introduced with regard to the rules of providing advisory and asset management services, restrictions regarding the distribution of certain products and related information, disclosure and notification duties as well as to rules regarding investment restrictions for clients from certain countries. Moreover, there has been a fundamental revision of the guidelines and monitoring measures for business relationships with domiciliary companies and external asset managers. Finally, UBS performed a fundamental review of its own range of estate and wealth planning instruments: it has subjected the providing of services in this area to new internal guidelines and to strict risk monitoring. In particular, UBS does not offer services in this business sector whenever the client advisor is aware, or has indications, that the client intends to make use of such services for the purpose of avoiding taxes. With these measures in place, UBS is convinced that it will appropriately master and control existing risks and future opportunities in the constantly changing environment of the cross-border wealth management business.

UBS kept FINMA regularly informed about the progress made in implementing these measures. FINMA will mandate an independent auditing company in the fourth quarter of 2010 to review the adequacy and effectiveness of these measures for controlling the legal and reputational risks.

– *Enhanced organization and framework of instructions and controls regarding the implementation of the QI Agreement:* In order to enhance instruction and control processes with regard to compliance with the QI Agreement, UBS has introduced the functions of a "Group Head US Withholding and QI Compliance" and a "QI Tax Coordinator". The persons responsible for these functions, supported by additional personnel and additional financial resources, have improved the entire instruction and monitoring framework. Over the last year, the auditing company KPMG has reviewed the implementation of the new measures and recently confirmed the successful completion thereof in a comprehensive report to the DoJ and the IRS.

– *Ensuring the independence of the legal and compliance functions:* The events that transpired in the US cross-border business have highlighted the importance of maintaining the full independence of the UBS legal and compliance functions. Today, the reporting lines within Legal & Compliance always must take precedence over the information lines to the line functions; dual reporting lines have been abolished. In addition, UBS has assigned the exclusive authority for decisions for remuneration and promotion issues in Legal & Compliance to the UBS General Counsel. Finally, by introducing the function of a head of global compliance with central units, UBS has strengthened significant aspects of global compliance procedures and monitoring.

Part III.A **(cf. below page 32 ff.)** of this transparency report presents background information on the circumstances that led to the proceedings before the US judicial authorities. The investigations conducted by UBS in connection with the cross-border wealth management business in the US are described in Part III.B **(cf. below page 35 ff.)**. Details on the review conducted by domestic and foreign supervisory authorities follow in Part III.C **(cf.**

**below page 38 ff.).** Finally, Part III.D **(cf. below page 43 ff.)** provides information on the measures that UBS implemented to conduct its future cross-border wealth management business in full compliance with applicable domestic and foreign regulations.

**Liability issues**

On 15 December 2009, the UBS Board of Directors announced that it will not initiate criminal or civil action against the former directors and senior officers of the bank. The public prosecutor of the canton of Zurich had previously communicated that no initial grounds for suspicion had been established that would justify initiating a criminal investigation against any former UBS directors or officers.

The UBS Board made the decision after careful consideration based on reports of a number of law firms that had examined the question of liability, and further based on a comprehensive documentation resulting from the investigations of these matters. Having re-examined all relevant facts, the Board stands by this decision. It is convinced that the decision not to initiate criminal and civil action against former directors and senior officers is based on a correct legal assessment, and is in the best interests of UBS.

It is important to emphasize in this context that the risk control failures in the US mortgage business or insufficient compliance in the US cross-border wealth management business do not automatically result in civil liability on the part of the members of management or of the Board of Directors. Rather, liability of the former directors and senior managers is contingent upon the fulfillment of certain legal requirements. Liability of directors and officers is dependent upon the fulfillment of four conditions: a breach of the duty of care, a loss, a so-called causal link between the breach of duty and the loss, and a personally attributable fault.

In particular, in view of the strict legal requirements of liability claims in Switzerland and weighing all relevant factors, the Board of Directors concludes that filing directors' liability actions is not in the interest of the company, and that the filing of such actions cannot be justified by a reasonable cost/benefit analysis. This conclusion is based on the following considerations:
– *Prospects of success of an action:* Neither the SFBC investigation nor the preliminary investigation by the public prosecutors produced findings to suggest that a successful outcome of a lawsuit was sufficiently likely. UBS itself has commissioned a number of extensive internal and external investigations since 2007. These investigations also did not produce such findings.

Furthermore, the damages that could be recovered by an action against former directors and senior managers would be limited to the personal assets of the defendants concerned and the level of insurance coverage (whereby successful claims for insurance coverage would ultimately result in UBS indirectly financing these insurance payments through increased insurance premiums). It should be noted in this context that a number of former directors and senior managers, who may have been faced with an action, waived claims for or repaid salary and bonus payments in

an amount of more than 70 million francs. The Board of Directors viewed these gestures as an indication that the former directors and officers of the bank had acknowledged at least their moral responsibility, even if they were not to be held liable under the law.
– *The interests of the company:* Based on its duty of care under corporate law, the UBS Board of Directors had not only to assess whether a lawsuit promised a successful outcome, but also whether such a lawsuit would be in the interest of UBS and of its shareholders. This follows from the statutory duties of the board of directors of a stock corporation to safeguard the interests of the company in all its actions and decisions. The UBS Board must therefore also consider whether an action against former directors and senior managers would be in the interests of the company. The Board can and must therefore decide against an action if it concludes that a lawsuit would cause more harm than good to the company.

The Board carried out a cost/benefit analysis that took into account the costs of an action, the amount of management time and attention that would be absorbed by it and the negative publicity effects that such litigation would bring, including a public discussion with negative headlines focusing on the past failings of UBS rather than on the newly organized bank. In the opinion of the Board, the likelihood of success of a lawsuit was not sufficiently high to justify these costs and negative effects.
– *Potential further consequences of an action:* Class-action suits against UBS are already pending in the US in which billions of dollars are claimed. UBS is of the opinion that these claims lack any basis both as regards the facts and the law, and it will vigorously defend its interests in these proceedings. If UBS now brings an action in Switzerland against its former directors and senior managers, under normal US practice this alone could be considered – regardless of whether such an action ultimately succeeds or fails – an admission that they had in fact acted improperly. This would severely impede UBS's defense in these proceedings.

In addition, one would have to expect "free riders" of all kinds to join in such an action in Switzerland. All this would have unforeseeable negative implications for UBS and, given the enormous significance of business with the US and other foreign clients throughout its history, for the entire Swiss banking industry as a whole.

Finally, an action could produce a situation in which former directors and senior managers attempt to assign blame to and litigate against one another or even seek to draw present directors and managers of UBS into such proceedings. This would serve neither the interests of UBS nor those of its shareholders.
– *Impact on shareholders:* Ultimately, the costs of an action initiated by the company – or of pending proceedings in the US – would have to be borne by the shareholders as the owners of UBS. Therefore, an action would have direct consequences for each and every shareholder. The fact that the largest shareholders of UBS have never requested the company to initiate an action confirms the decision by the Board of Directors.

11

– *Looking to the future:* If the current UBS Board were to initiate an action against former directors and senior managers, it could be accused of throwing good money after bad. In addition, due to the above-mentioned side effects, UBS and its employees could be distracted for years from their day-to-day operations, while the confidence of clients and of the financial community in general might suffer. The Board of Directors feels that this would be irresponsible.

Having considered all the above factors and after weighing all arguments, the Board of Directors decided not to take further legal action against its former directors and senior managers. For all of the above reasons the Board is also against any initiative by third parties to file actions against former directors and senior managers or to even pursue actions at the company's expense.

Part IV.A **(cf. below page 51 ff.)** of this transparency report explains in detail the questions which UBS has examined in connection with potential directors' liability actions under corporate law. Part IV.B **(cf. below page 56 f.)** describes the investigations carried out by UBS and the public authorities in the field of criminal law. Part IV.C **(cf. below page 58)** explains in detail why the Board of Directors decided to refrain from pursuing civil and criminal action against former directors and senior managers.

### Where does UBS stand today?

The various analyses, opinions and reports summarized in this transparency report show a number of shortcomings in different areas of the company which together contributed to the problems UBS has faced. This suggests that cultural factors have supported the occurrence of these unfortunate developments. As a result of the internal and external investigations, the Board of Directors concluded that not only technical and financial market specific, but also cultural factors contributed to the problems of UBS. Acting on this conclusion, the new management of UBS is endeavoring to create a more sustainable corporate culture within UBS. At the same time, it must be emphasized that throughout the financial market crisis, that is, from mid-2007 through the beginning of 2009, many UBS employees and managers remained unfailingly committed to maintaining daily business operations. Today, UBS is of the opinion that it has learned its lessons from the crisis and that it has made significant progress in recent months. UBS is the largest bank in Switzerland and a worldwide leader in wealth management. It has stabilized financially and is well capitalized with a Tier I capital ratio of 16.4 percent as of the end of June 2010. UBS has also been recording profits again since the fourth quarter of 2009. In the first half-year of 2010, pre-tax consolidated profits amounted to 5.4 billion francs. The bank's risks, measured in terms of its risk-weighted assets, and its balance sheet total have been reduced by nearly 50 percent since mid-2007.

Since the outbreak of the financial market crisis, the Board of Directors and the Group Executive Board have undergone a comprehensive process of renewal, in terms of both the composition of their membership and their functional operations. The governance structures needed for steering the bank's business in a consistent manner and for effective monitoring have been put in place.

The new Board of Directors and senior managers place the utmost importance on UBS and its employees being perceived as trustworthy partners. For this reason, it has given intense attention and consideration to the priorities of the business, its structure and processes, and the new corporate culture. The paramount objective was to create a new UBS capable of sustainable high performance.

The following cornerstones indicate the priorities that UBS will be pursuing in its various business divisions:

– *Wealth Management:* UBS plans to further strengthen its position in wealth management for private clients. In doing this, it is of the utmost importance that the rules and regulations of the individual countries be respected at all times – and without exception. In this regard, UBS has issued internal guidelines and instructions that are among the most stringent in the industry and which set new industry standards.

– *Investment Bank:* The business model and monitoring structures of the UBS Investment Bank have undergone a comprehensive revision. Its individual business units have now been closely coordinated with each other and are closely monitored. Its business focus is clearly directed toward advisory and client services, while the level of proprietary trading has, accordingly, been drastically reduced.

– *Asset Management:* In the area of institutional asset management, UBS has carried out various initiatives for ensuring that a consistently high level of investment performance is achieved. Internal cooperation with the bank's wealth management divisions and with the Investment Bank has been intensified and institutionalized to provide clients with a wide offering and a maximum of added value.

– *Regions:* In the domestic Swiss market, UBS intends to maintain and further strengthen its number one position. As the main capital market in the world the US will remain pivotal for the investment banking activities of UBS. Asia is crucial as a growth market for all business divisions.

With regard to the company's corporate culture, three main strategic principles have been defined to which all employees are expected to conform: reputation, integration and execution. These principles are supplemented by the core values of truth, clarity and performance. At the beginning of 2010, UBS introduced a new, comprehensive code of conduct and ethics. The principles and standards described in the code make it the personal responsibility and duty of every employee to act in a compliant and ethically correct manner.

Switzerland plays a special role for UBS because it has its roots here and, with respect to its business divisions and client segments, the bank is firmly linked to this country. UBS headquarters are located in Switzerland and over a third of its entire personnel, that is over 23,000 employees, are located here. UBS is one of the largest listed companies in the country. Roughly 2.5 million private Swiss individuals and some 135,000 Swiss companies – that is, nearly every second enterprise in the country – have a business relationship with UBS. UBS also plays an important role for Switzerland both as an employer and as a

provider of professional training in banking: in 2010, nearly 700 new university graduates, over 800 interns and some 300 trainees have already been hired.

UBS plans to strengthen its relationship with all Swiss interest groups, to encourage dialogue and to communicate more actively. It hopes to create understanding for its own positions and actions and, at the same time, understand the positions of others. The fact that UBS brings its own interests to discussions about Switzerland's future as a financial center is a part of the responsibility it bears toward its clients, its shareholders and its employees all around the world. At the same time UBS recognizes and takes into account its relevance for the stability of the Swiss financial system.

UBS is convinced that is has overcome the crisis. Where UBS stands now and its priorities for the future are described in Part V **(cf. below page 59 ff.)** of this transparency report.

# III. US cross-border wealth management business

# A. How did the issues with the US authorities arise?

## 1. UBS's cross-border wealth management business

UBS serves clients all over the world. Some of UBS's clients are served by branches in the countries in which these clients reside. This business is referred to as "onshore business". Other clients have an account with a UBS branch outside of their country of residence; these clients are served on a cross-border basis by way of so-called "cross-border" or "offshore" business. As is the case for most other Swiss banks, the cross-border wealth management business is an important line of business for UBS. In addition to its network of branches in Switzerland, UBS has branches in all key European financial centers and in the US, Hong Kong, Singapore and in other countries. These branches have been serving clients both locally and on a cross-border basis for many years.

The business area that was the subject of the investigations conducted by the US authorities is the US cross-border wealth management business through which UBS serviced US-resident clients (US cross-border business). The US cross-border business was operated, on the one hand, by UBS branches in Switzerland and, on the other hand, by UBS branches abroad located outside the US. In Switzerland these clients were mainly served by a specialized department of the Americas International unit, with some 40 to 60 client advisors. The business in general had been declining since 2000 and with approximately 1 percent of total assets under management, the US cross-border business constituted only a very small part of UBS's entire wealth management business.

The US cross-border business must be distinguished from the much larger and separately-run wealth management business that a US subsidiary of UBS operates in the US. This on-shore business became more significant when UBS took over the US stock brokerage and asset management company Paine Webber in the year 2000. The matters discussed in this chapter bear no relation to these on-shore activities.

## 2. Legal framework

When providing services to clients resident in the US, not only Swiss law, but also US law, must be observed, in particular the provisions of the US securities laws and US tax law.

### a) US tax law

In general, the US impose taxes on everyone in relation to certain income from US securities (dividends and interest). In the case of so-called "US persons" (US citizens or persons resident in the US; US taxpayers), such income is taxed on a net income basis. In the case of so-called "non-US persons" (foreign citizens not resident in the US, so-called "Non-Resident Aliens" or "NRAs") such income is generally subject to a withholding tax of 30 percent of the gross amount, subject to reduction under applicable Double Taxation Treaties (DTTs).

US tax law provides for the following to ensure that such income is correctly taxed:
– In the case of US taxpayers, the entity making payment of dividends, interest or sales proceeds (so-called "Paying Agent") must provide information reporting to the IRS about the payments stating the recipient's name and the so-called taxpayer identification number. If the Paying Agent is not in a position to do so, it must deduct withholding tax, the current rate of which is 28 percent, from the gross amount (so-called "Backup Withholding Tax") and remit such tax to the IRS.
– In the case of NRAs, the Paying Agent is required to deduct US withholding tax of 30 percent of the gross amount subject to withholding unless the NRA is resident in a country which has concluded a DTT with the US. In this case, depending on the provisions of the applicable DTT, a lower rate (often 15 percent or even less) of US withholding tax may apply.

In the 1990s, the IRS was concerned that the ability of the US to properly tax revenues with respect to US securities held in accounts at foreign banks suffered from the following weaknesses:
– First, the residence of an NRA was not used to determine whether a DTT applied, but rather the address of the foreign bank through which these NRAs held US securities. This enabled clients of banks located in countries which had concluded a DTT with the US (for example Germany, the Netherlands, England) to benefit from a lower rate of US withholding tax even though the country in which these clients were resident (for example Saudi Arabia) had not concluded a DTT with the US. This practice of exploiting more favorable DTTs was referred to as "Treaty Shopping". This was, however, not possible in Switzerland since Switzerland was already collecting and providing to the IRS, on the basis of the old DTT with the US from the year 1952, in addition to the ordinary withholding rate of 15 percent, a further withholding tax of 15 percent (the so-called "Additional Withholding Tax USA") from all clients with respect to income from US securities.
– Second, US Taxpayers could hold US securities through accounts at foreign financial institutions without the income derived from such securities and their identity being reported to the IRS, provided they were prepared to accept a US withholding tax rate of 30 percent on dividend or interest income from such securities.

### b) Qualified Intermediary Agreement

Toward the end of the 1990s, in order to address these weaknesses, the IRS completely revised the US withholding tax system which led to the establishment of the so-called "Qualified Intermediary System (QI System)".

The "Qualified Intermediary Agreement (QI Agreement)" was of central importance to the QI System. This is a standard agreement drafted by the IRS which foreign banks could conclude with the IRS. The QI System and the QI Agreement came into force on 1 January 2001. In total, in addition to UBS and almost all other Swiss banks, over 6,000 financial institutions worldwide decided to adopt the QI Status

If a foreign bank concluded a QI Agreement with the IRS, the bank (the "Qualified Intermediary", or "QI") was authorized to determine the applicable US withholding tax rate for its NRA account holders in accordance with the relevant DTT without reporting the identity of the account holders to the IRS or any US intermediary. If the client is a US taxpayer, the client is required to provide the QI with an IRS Form W-9, in which he informs the QI of his US taxpayer identification number, and the QI is required to provide such form to the appropriate Withholding Agent or to perform information reporting including the client's identity to the IRS with respect to income from US securities earned by such client. If the US client refuses to execute a Form W-9 and the QI is prohibited by law from disclosing the identity of its account holders, the QI has to ensure that the client does not hold any US securities in its accounts with the QI.

The QI Agreement thus allows a foreign bank to grant NRAs who wish to invest in US securities the advantages of lower withholding tax rates, in accordance with the respective applicable DTTs, without having to disclose their identities to the IRS. Moreover, the QI Agreement allows foreign banks that are prohibited by law from disclosing the identity of their account holders to maintain securities accounts for US Taxpayers as long as they ensure that those US Taxpayers who do not consent to their identity being reported to the IRS do not hold any US securities in such accounts. In turn, the QI Agreement imposes far-reaching documentation, notification and withholding tax collection duties on the QI. Whether these provisions are being observed must be reviewed at regular intervals by independent auditors. From a Swiss perspective it is of importance that the QI System recognizes and preserves the Swiss banking secrecy.

In this connection, it is worth noting that the US is planning to amend the QI System in accordance with recently enacted provisions of the US Internal Revenue Code commonly referred to as the Foreign Account Tax Compliance Act (FATCA). These provisions essentially provide that foreign financial institutions whose clients intend to invest in US securities and who wish to benefit from applicable DTTs will have to obtain – by force of agreement with the IRS – consent from all US Taxpayers to disclose their identity to the IRS. This obligation applies independently of whether the US taxpayers invest in US or any non-US securities. Therefore, following the effective date of the FATCA provisions, US Taxpayers who are clients of foreign banks that have concluded such an agreement will no longer be able to hold US securities without consenting to the disclosure of their identity to the IRS, something that is still possible under the QI System. If the foreign financial institutions do not enter into an agreement with the IRS under FATCA provisions, the IRS will apply withholding tax at a rate of 30 percent on all income, including capital gains, that its US and non-US clients receive on US securities held at such financial institutions.

### c) Financial market supervisory law

Anyone providing broker-dealer or investment advisory services in the US in return for remuneration is subject to various statutory requirements. Anyone involved in securities trading, providing investment advice or asset management must, for example, be registered and have a license. This also applies to any financial institution that conducts cross-border business in the US in which securities-related services are provided to US clients in the US irrespective of whether such services are provided to the client in a face-to-face discussion or by e-mail, telephone, fax or post (so-called "US Jurisdictional Means"). It is therefore not permitted, for example, without a license, to take an order in the US concerning the purchase or sale of shares or to provide advisory services with respect to securities. If such services are provided to a US client outside the US, for instance when he meets a client advisor in Switzerland, the US financial market supervisory law does not normally apply. On the other hand, asset management activity without a license is permitted if the US client enters into a discretionary asset management agreement in Switzerland and the Swiss bank subsequently carries out this agreement independently and exclusively in Switzerland.

At the beginning of this millennium, UBS, like practically all banks in Switzerland, was not registered with the SEC to provide securities-related services and was thus subject to the restrictions against providing unregistered securities-related services (SEC Restrictions). It was not until the year 2005 that a subsidiary of UBS, which was licensed with the SEC, commenced activities in Switzerland.

### 3. UBS's US cross-border business between 2000 and 2007

Between 2000 and 2002, UBS was intensively occupied with, and invested substantial resources into, the implementation of the QI Agreement. This was an extremely complex and expensive process. Amongst other things it was necessary to obtain from all clients worldwide who held US securities in their UBS accounts, documentation that satisfied the requirements of the QI Agreement and, depending on the determination of the tax status of the client, to set up corresponding notification and withholding processes. This required extensive amendments to client documentation and adjustments of the internal processes and IT systems. The fact that numerous implementation details were unclear but could not be clarified by the IRS, or could be clarified only with delay, further complicated the situation. UBS also issued a number of internal guidelines intended to ensure compliance with the provisions of the QI Agreement.

A particular challenge existed in connection with legal entities that were not organized in the US (trusts, foundations and corporations), and which were defined under Swiss money laundering regulations as so-called "domiciliary companies". Their treatment according to US tax law and the QI Agreement was and still is unclear. A central question concerned whether such domiciliary companies were to be treated as so-called "flow through" entities (the consequence being that such company's income, pursuant to US tax law, would be treated as income of the beneficial owner of the company), or had the sta-

tus of so-called "non-flow through" companies. The latter had to file a so-called IRS Form W-8BEN and were therefore treated, pursuant to US tax law, as separate, non-US tax subjects. In this connection, UBS and other Swiss banks were particularly concerned with the question of how to deal with domiciliary companies held by NRAs that invested in US securities. If these were to be treated as "flow through" companies, according to the principles of US tax law and the QI Agreement, the identity of NRAs would have had to be reported – which actually would have been inconsistent with the QI System. When implementing the QI Agreement this fact led to a different treatment of domiciliary companies held by NRAs and domiciliary companies belonging to US clients.

On the basis of the SEC Restrictions and the QI Agreement, various models to serve clients residing in the US were available, including outsourcing the US client business to an external asset manager which would use UBS as depositary bank. During 2002, UBS finally decided on a model under which all existing business relationships with US clients would be converted into discretionary asset management agreements. In such cases, the client transfers the management of his assets entirely to the bank, and thereafter no longer instructs the bank as to individual investment transactions. At the same time, far-reaching restrictions were issued with respect to cross-border advice and accepting agreements to purchase or sell securities (so-called "Revised Business Model").

Once the decision regarding the Revised Business Model had been made, the next step was to monitor the transfer of the approximately 3,000 US clients who had provided UBS with an IRS Form W-9 (and thereby consented to information reporting to the IRS) to a new subsidiary, which was registered with the SEC. These clients expected an all-encompassing service model which could not be properly guaranteed under the restrictions imposed by the Revised Business Model. Following the resolution by the Group Executive Board, early in 2004, to establish such a subsidiary, "UBS Swiss Financial Advisors AG (UBS SFA AG)" commenced operations on 1 January 2005.

In connection with the implementation of the Revised Business Model and the transfer of the so-called "W-9 clients" to UBS SFA AG, the services provided to US clients were centralized to a far greater degree than the services provided to the clients from other countries. The reason for this was the fact that the services to be provided to these clients were particularly complicated as a result of the SEC Restrictions and thus had to be provided by specially trained client advisors of the US Country Team.

In the year 2004, the instructions regarding US clients were placed on a new footing. In the same manner as for clients from other countries, the financial market supervisory law framework was set out in a "Country Paper USA" (Country Paper USA (2004)) – in the case of the US the above-mentioned SEC Restrictions – and rules of conduct were established. The Country Paper USA (2004) was the subject of training sessions and workshops attended by members of the US Country Team in the fall of 2004, and it was provided to all UBS employees on the intranet in the summer of 2005.

Further steps to reduce compliance risks were reviewed in the year 2006 within the framework of "Project Globus". On the basis of a presentation analyzing the US cross-border wealth management business, various measures were considered, including, among others, an even more extensive centralization of the US Country Team and travel restrictions. One of the possible measures mentioned was a complete withdrawal from the US cross-border business. In the end, seven of a total of 13 measures discussed were adopted, which, in the view of those responsible, were not expected to have any serious impact on the course of business. Other measures which might have further increased compliance with the SEC Restrictions were not taken.

On 17 March 2006, Bradley Birkenfeld, who had been employed since 2001 as a member of the US Country Team in Geneva, sent a letter to the then general counsel, Peter Kurer. In this letter Birkenfeld explained that, in the summer of 2005, he had discovered the Country Paper 2004, of which he had previously been unaware and which contained provisions diametrically opposed to the prevailing business conduct adopted by client advisors and required by line managers. Birkenfeld also stated that he had received no training with respect to the Country Paper USA (2004) and that his misgivings had so far gone unheard. The internal investigation ordered by Kurer, which was limited to the Geneva branch, reached the conclusion that, contrary to his assertion, Birkenfeld had indeed received such training. The investigation further confirmed that in some individual cases, clear – and in numerous other cases, potential – infringements of the Country Paper USA (2004) had actually taken place. Based on the results of the investigation report, Kurer ordered a series of new compliance measures, in particular, the revision of the Country Paper USA (2004), which was to be more clearly worded with specific "dos" and "don'ts", and the introduction of effective compliance inspections. Although the first training sessions based on a draft of the new country paper took place in the fall of 2006, the final version only came into force in the summer of 2007 (Country Paper USA (2007)).

Parallel to the drafting of a revised country paper, UBS subjected the US cross-border business to a strategic review. As a result of the difficulties which had already emerged in connection with conducting the business in line with the SEC Restrictions, UBS resolved, in August 2007, to wind down the business with US clients: no new US cross-border securities accounts were to be opened and all US travel was to stop entirely.

## 4. Contact by the US authorities

In September 2007 the US Department of Justice (DoJ) informed UBS that it had been informed by Birkenfeld of shortcomings in the US cross-border business which had been the subject of an internal UBS investigation in the year 2006. Later that year, the DoJ also informed UBS that it had information according to which certain US taxpayers may have misused domiciliary companies incorporated outside the US in the context of the QI Agreement in order to continue holding US securities and that the SEC Restrictions had not been complied with. In December 2007, UBS was also contacted by the SEC, the authority responsible for the enforcement of the SEC Restrictions.

# B. How did UBS handle the situation?

**Chronology of reports and events – US cross-border business**



## 1. Investigation by Wachtell, Lipton, Rosen & Katz

In response to the inquiries from the DoJ and the SEC, UBS immediately commissioned a comprehensive investigation with the objective of fully clarifying what had happened. UBS made it clear to all foreign and Swiss authorities from the outset that it intended to investigate all allegations swiftly and thoroughly and to provide them with a full report of the results, to the extent legally permitted.

Such investigations are commonplace in the US when allegations of potential corporate misconduct arise. They are generally carried out by law firms that are hired by the company concerned but are independent in carrying out their mandate. This conforms with the requirement of the US authorities which expect an objective, fact-oriented, and comprehensive report.

The investigation into the US cross-border business was carried out by the US law firm Wachtell, Lipton, Rosen & Katz (Wachtell). Wachtell is a leading New York law firm. An area of its activity for which it has received particular recognition is the conduct of investigations into possible corporate criminal and regulatory violations. Its expertise in this area derives, in particular, from the fact that several of its lawyers, including those responsible for the UBS investigation, are former federal prosecutors. Due to its experience and its commitment to conduct a careful and systematic investigation of the facts, the law firm enjoys a high degree of trust by the US authorities.

In order to guarantee that the investigation remained impartial, Wachtell reported, from summer 2008 onwards, directly and on a regular basis on matters relating to management liability to a Board of Directors' committee composed of the independent directors Sergio Marchionne, David Sidwell and Helmut Panke.

### a) Scope and course of procedure

Based on extensive discussions with the US authorities in order to gain an understanding of their concerns and allegations, Wachtell focused its investigation on the years 2000 to 2007, concentrating, in particular, on the following two issues which were of central importance in terms of compliance with the QI Agreement and the SEC Restrictions:

– First: the circumstances under which, in the framework of the implementation of the QI Agreement, domiciliary companies controlled by US Taxpayers were set up for the purpose of holding US securities without notifying the IRS. In this connection the extent to which UBS client advisors were involved in these activities and whether the top management had knowledge hereof, tolerated such action or even promoted it, had to be investigated.

– Second: whether and to what extent the activities of client advisors violated the SEC Restrictions when serving clients. The subject of the investigation was, in particular, whether client advisors had provided securities-related services – including providing investment advice and taking securities-related instructions and transactional orders – to their US clients while in the US or by using telephone, facsimile or e-mail. The scope of the investigation also included the question whether the management of UBS was aware of such activities, had encouraged or at least tolerated them.

Wachtell investigated the relevant facts in the most comprehensive manner with the support of various specialists, including forensic auditors, IT specialists, etc. In addition to an analysis of all relevant transactions (including, for example, account openings and account movements) and the examination of relevant