III. US cross-border wealth management business

account documentation, e-mails of more than 300 employees, agendas, protocols, instructions, memoranda and numerous other documents (in total approximately 1.5 million e-mails and other documents in electronic form were reviewed), several dozens of interviews of several hours' duration, were conducted with client advisors and other employees. The investigation team included some 100 members, both internal and external. It was one of the most comprehensive investigations ever conducted by a Swiss company in Switzerland.

The investigation was carried out exclusively on the premises of UBS in Switzerland and was conducted in accordance with the relevant provisions of Swiss data protection law and Swiss banking law.

The results of the investigation, the total costs of which amounted to more than 50 million Swiss francs, were compiled in a report dated 14 October 2008 (the "Wachtell Report"). The Wachtell Report, which is 170 pages in length, with numerous appendices, was submitted to the SFBC, the DoJ, the IRS and the SEC in mid-October 2008.

### b) Conclusions drawn by UBS from the Wachtell Report

A review of the Wachtell Report led UBS to conclude that during the years 2000 to 2002, with the introduction of the QI System, it had undertaken substantial efforts to structure and document its account relationships with the account holders concerned to ensure that the requirements of the QI Agreement and US tax law had been fully complied with. For example, UBS had to contact roughly one million clients, in some cases more than once, in order to inform them of the requirements of the QI System and to obtain the required confirmations, instructions or forms from them. In the area of IT major adjustments had been made to enable the systems to identify US securities and to ensure that US clients who had not submitted an IRS Form W-9 could not hold any US securities. Moreover, US securities of US clients who did not respond to the request to submit an IRS Form W-9, were sold.

UBS made intensive efforts, in close cooperation with other Swiss banks and the Swiss Bankers Association, to satisfy the requirements of the QI Agreement through the framework of the instructions. These instructions were generally in line with the requirements of US tax law and the QI Agreement. In particular, they defined important differences with regard to the treatment of US clients on the one side and NRAs holding domiciliary companies on the other.

Within the bank, however, there had been instances of conduct contrary to instructions. It was established, for example, that certain UBS employees in the US cross-border business assisted US clients in setting up non-US domiciliary companies with the help of their external advisors, the aim of which was to enable the clients to continue holding US securities without submitting an IRS Form W-9.

Specifically a number of accounts were discovered which were opened for non-US domiciliary companies before the QI Agreement took effect. In these accounts, US securities in an amount of some 310 million francs were held. It was also established that some client advisors and their superiors had treated certain domiciliary companies as separate legal entities although they were aware that the necessary corporate require-

ments were not fully satisfied. In such cases the revenues deriving from US securities, pursuant to the QI Agreement, should have been treated as if obtained by the US beneficial owner of such entity (sham companies).

Also in subsequent years, other domiciliary companies had been set up for US clients in a number of cases in a similar manner without such practices being adequately reviewed or questioned.

As regards compliance with the SEC Restrictions, UBS ascertained that in the years 2004 to 2007 some 30 to 40 client advisors traveled regularly from Switzerland to the US for up to two-week visits and visited between 20 and 40 US clients on each occasion. While in the US the client advisors could access their clients' account information. A forensic analysis of the most important accounts of approximately 20 client advisors, along with numerous interviews with client advisors, confirmed that the SEC Restrictions were violated on a regular basis during business trips to the US and also during contacts from Switzerland.

The detailed investigations included various measures taken in the years 2001 to 2007 to bring the US cross-border business in line with the US tax laws and SEC Restrictions.

While UBS had made a substantial effort designed to achieve compliance with the SEC Restrictions, there had been deficiencies in the practical implementation of these measures. For example, in connection with the implementation of the Revised Business Model, UBS concluded that ultimately only some of the clients concerned were prepared to conclude a discretionary asset management agreement with UBS. Further, it took a long time for UBS SFA AG to become operative, the result of which was that so-called W-9 clients were serviced in repeated breach of the SEC Restrictions for a period of some three years.

Based on its analysis of the Wachtell Report, UBS concluded that insufficient attention had been paid to the compliance problems in the US cross-border business. The main problem had been the lack of effective oversight. There also appeared to have been deficiencies in terms of training and instructions and/or their implementation. For example, client advisors were aware that they were not permitted to accept any mandates from US clients during their visits to the US. However, it was generally assumed that other actions, such as the handing over of bank statements or investment documentation on US territory, would be tolerated by their superiors.

On a general level it was, however, established that client advisors assumed that a certain degree of non-compliance was unavoidable if the US cross-border wealth management business was to be maintained, and that this would be tolerated by their line managers.

As regards UBS's top management, UBS concluded that it was not reasonable to expect, given the fact that the US cross-border business represented a mere 1 percent of UBS's entire wealth management business, that they would follow the day-to-day operations of that business or be fully aware of the highly technical and complex aspects of the QI Agreement and of US tax and securities law as it applied to that business. In actual fact, the top management must, in principle, be able to rely on the responsible line managers and specialists from the tax and legal departments and from compliance to keep them informed

about important issues which require intervention by top management, and on them correctly implementing the instructions issued and the measures ordered.

## 2. Internal disciplinary investigation by UBS

At the beginning of 2009, UBS reviewed the conduct of employees from a disciplinary perspective on the basis of the results of the internal and external investigation and the applicable instruction framework including the responsibilities that such framework had determined. The decision of the required sanctions was taken by a group management committee which was composed of persons who had not been involved in the US cross-border business. The Board of Directors' committee approved these decisions. Both the US authorities and FINMA were informed of the measures taken. The authorities did not raise any objections.

The disciplinary measures affected approximately two dozen employees. A considerable number of employees who would also have been subject to disciplinary sanctions had already left UBS during the course of the preceding years. The disciplinary measures taken included dismissals, warnings and reprimands in combination with reductions in remuneration and promotion blocks. In addition to client advisors and their superiors, employees in other functions were affected.

## 3. Why did the problems in the US cross-border wealth management business occur?

UBS concurs with the assessment of the reasons leading to the problems in the US cross-border wealth management business as confirmed by the SFBC. Accordingly, in the Statement of Facts UBS has admitted responsibility for certain misconduct. Below, the main causes are again summarized, as seen from UBS's perspective:

– *Lack of a comprehensive and continuous risk analysis:* From 2000 onwards, UBS had increasingly identified the risks associated with the US cross-border business, both in connection with the implementation of the QI Agreement and with compliance with the SEC Restrictions. However, with a few exceptions, these two issues were addressed separately when assessing the risks and taking measures. Further, the risks resulting from the concurrent operation of both an onshore and an offshore business were not sufficiently considered. The consequences of different authorities jointly proceeding in order to enforce their respective regulations and increased risk profile of UBS due to its US operations were not adequately assessed in an overall context. Too much reliance was placed on the fact that the SEC historically had not strictly enforced the SEC Restrictions against foreign banks, and failed to implement adequate measures in a timely manner in response to the consequences resulting from the increasing focus the US authorities placed on the enforcement of their tax regulations and the growing domestic political pressure in the US.

– *Hesitant and incomplete implementation of measures:* Since UBS had identified, at least on an isolated basis, the risks attaching to the US cross-border wealth management business, senior management had decided to take various measures over the last years to ensure compliance with the relevant US regulations. However, there was a lack of rigor and speed when implementing these measures. This applies, for instance, to the adjustment of the business model in the year 2002, the preparation and the formation of UBS SFA AG and the implementation of the measures adopted following the investigation concerning Birkenfeld's whistle-blowing. Line managers in the US cross-border business focused on acquiring new business opportunities while too little attention was paid to the management of the risks associated therewith. Repeatedly, measures which had been decided upon were implemented only slowly and incompletely.

– *Shortcomings in the implementation of and in the continuous adherence to the QI Agreement:* UBS had implemented the QI Agreement largely in a correct manner and with enormous efforts. However, client advisors in the cross-border business were allowed too much discretion, and there was a lack of effective controls. Whether domiciliary companies were handled properly was often examined in a "form over substance" manner, without assessing whether in fact a sham company was involved. This allowed certain client advisors in a number of cases to assist clients in circumventing restrictions relating to the holding of US securities.

– *Insufficient compliance culture and lack of control:* UBS did not sufficiently pay attention to the complete and sustainable compliance with the complex regulations applicable to the cross-border wealth management business with clients residing in the US. There was a lack of effective control of the business, and shortcomings on the side of the employees involved were not vigorously rectified. There were also shortcomings in training and instructions as well in the structuring of the incentives. The internal regulations were imprecise and the expectations as regards compliance with these guidelines were not communicated with the required sense of urgency. This led client advisors to misconceive that a certain degree of non-compliance was tolerated by their line managers, which actually in part turned out to be the case. To a certain extent such business conduct did continue and remained undetected, as up until 2009 no independent controls were performed. Partly this was also the result of a governance structure which was not appropriately aligned to support a fully effective control framework. The compliance department responsible for the cross-border business was embedded in the organization of the CEO and the CFO of the Wealth Management & Business Banking division. Further, compliance with the country papers was not subject to the usual review cycles, since country papers were not considered as instructions in the formal sense.

UBS believes it has addressed these problems and their underlying causes by various measures **(cf. below page 43 ff.).**

# C. How did the supervisory authorities react to the events?

**1. Investigation by the Swiss Federal Banking Commission**

a) Scope and course of procedure

The SFBC was informed by UBS in December 2007 about the investigations conducted by the DoJ and the SEC. On 23 May 2008 it opened its own investigation into these matters.

The following four issues were the subject of the SFBC investigation:

– *Actively assisting with tax fraud:* Did UBS or employees of UBS actively participate in the tax fraud committed by their clients?

– *Submitting false declarations:* Did UBS, within the scope of its obligations as a QI or otherwise, submit false declarations or reports to the US authorities, in particular to the IRS?

– *Violations of the QI Agreement:* Did UBS violate the QI Agreement and if so, how serious were these violations?

– *Method of dealing with the legal and reputational risks:* How did UBS and its employees deal with the legal risks resulting from the cross-border business in the US within the framework of the QI Agreement?

The 161-page "SFBC report on the implementation of the Qualified Intermediary Agreement and on UBS's cross-border services in the USA" dated 17 December 2008 (SFBC Cross-Border Report) summarized the results of this investigation and served as the basis of the order of 21 December 2008 directed against UBS (SFBC order) which concluded the SFBC's extensive investigation.

The SFBC commissioned an authorized investigator who confirmed that the internal investigation of UBS was appropriate. On the basis of extensive investigations of its own, including questioning Wachtell attorneys and the employees involved in the UBS investigation, the authorized investigator concluded that there were no indications that the former UBS management had influenced the internal investigation. Finally the authorized investigator was commissioned to write a report on the Swiss financial market's traditional attitude toward selected aspects of the QI regime.

The SFBC was provided with the work products which had resulted from Wachtell's independent investigation. For example, UBS provided the SFBC with the extensive documentation which had been compiled during the course of this investigation. This included minutes of meetings, legal opinions, audit reports by internal and external auditors, extensive collections of e-mails and personal documentation from individual employees questioned. The SFBC was granted access to all documents which were provided to the US authorities by way of administrative assistance. Furthermore, the SFBC had at its disposal the Wachtell Report and the comprehensive documentation on which this report was based. In addition, the SFBC requested UBS to submit further, more extensive documentation. Finally the SFBC interviewed over 20 UBS employees including Peter Kurer, Group General Counsel (2001 to 2007), Marcel Rohner, CEO business group (Global) Wealth Management & Business Banking (2002 to 2007), Raoul Weil, head of business area Private Banking International and later Wealth Management International within the business group (Global) Wealth Management & Business Banking (2002 to 2007), Martin Liechti, head of business unit Americas International (2001 to 2007), Michel Guignard, head of business sector North America (2002 to 2007) and his predecessor Hansruedi Schumacher, head of business sector North America International (1998 to 2002).

b) Conclusions

*(1) Implementation of the QI Agreement*

The SFBC Cross-Border Report concluded that the efforts undertaken by UBS with respect to the entry into force of the QI System and in compliance with its duties as contractual partner of the IRS had been substantial and that UBS, despite the intense time pressure, had in general correctly implemented the QI Agreement. A few weaknesses had been detected where project organization and project management were concerned and, once these weaknesses had come to light in the year 2002, the project group was immediately reconstituted.

At the same time, the SFBC Cross-Border Report also pointed out that, in retrospect, there were other weaknesses in the implementation of the QI Agreement. In the SFBC's opinion, the most significant weakness was that UBS assigned the responsibility for the execution of certain specific measures to the client advisors without monitoring their implementation activities. The lack of monitoring enabled individual client advisors (with the knowledge of middle management) to assist US clients in the misuse of non-US domiciliary companies which were created, controlled and managed by external advisors and asset managers for the purpose of continuing to invest in US securities (sham companies). In some cases, therefore, client advisors had assumed an active role in relation to the providing of (tax) advice to US clients which raised concerns about their potential participations in tax offenses. Furthermore, these activities were not compatible with the contractual obligations entered into by UBS vis-à-vis the IRS.

When implementing the QI Agreement, the line management responsible for the North America wealth management business failed to enforce a rigorous compliance culture, in particular with regard to wealthy US clients. However, the investigation did not reveal any indications that top management had knowledge of these breaches of the QI Agreement. In fact, UBS's senior management took adequate measures each time it became aware of compliance problems in connection with implementation of the QI Agreement. According to the SFBC report, the fact that these deficiencies were not discovered at the highest levels for more than six years resulted from the responsibility for monitoring compliance with the obligations under

the QI Agreement not having been completely and clearly defined and, further, from a lack of sufficient control over the activities of those responsible for the US cross-border business.

In summary, the SFBC Cross-Border Report concluded that UBS as an institution violated the fit and proper conduct and organization as required under the Banking Act as it had taken risks that could be neither controlled nor monitored.

### (2) Compliance with the SEC Restrictions

The SFBC Cross-Border Report concluded that UBS did not demonstrate a sufficient determination to comply fully with the SEC Restrictions. The SFBC noted that there were a few specific directions imposed by management relating to the US cross-border business which had direct implications for client advisors. These included, among others, the Revised Business Model, according to which discretionary asset management agreements should have been concluded with US clients, and directives that the rendering of advisory services and accepting orders relating to securities transactions in the US by telephone and e-mail was no longer permitted. Then, in 2004, the Country Paper USA (2004) was prepared which provided guidance relating to the SEC Restrictions and their application to the activities of client advisors. However, it was only after the revised Country Paper was issued in 2007 that monitoring of compliance with the instructions contained therein was introduced. According to statements made by the business area North America, this lack of monitoring was the result of the concern that such supervision would negatively affect the business.

Although UBS considered the traveling activities of its client advisors to be a practice that presented potential compliance risks, it did not oblige its advisors to confirm that they were observing the requirements set out in the Country Paper USA (2004). Measures to prevent client advisors from accepting orders for securities transactions during their visits to clients in the US or from meeting with potential clients in violation of the SEC Restrictions were either ineffective or not adequately enforced.

The reputational risks taken in this respect were not given sufficient attention. Apart from noting that there appeared to be a lack of interest by the SEC in enforcing these restrictions against foreign financial services providers, there was little evidence in the documents to show that deliberations had taken place on the consequences of failure to comply with the SEC Restrictions.

In the SFBC's opinion, UBS's decision to accept a violation of the SEC Restrictions with respect to delays in entering into discretionary asset management agreements with the clients when implementing the Revised Business Model was understandable. This was, however, no longer understandable in the period after 2007, as by that time it had long been common knowledge that these business practices were not fully in line with the applicable US provisions.

The SFBC held that UBS subsequently accepted that clients who had submitted a Form W-9 but did not conclude a discretionary asset management agreement were not subject to the restrictions of the Revised Business Model and could thus continue to be actively served. What was initially intended to be a temporary solution until UBS SFA AG had been established continued to be practiced for another three years. The problems

had been known since mid-2002, at the latest, by the line management responsible for the "Americas International" business. In the SFBC's view, it was incomprehensible that the bank did not take any additional measures to limit the resulting reputational risks.

The SFBC Cross-Border Report concludes that UBS took uncontrolled legal and reputational risks by tolerating violations of the SEC Restrictions and of internal instructions by client advisors and, as such, had violated its obligation to demonstrate fit and proper conduct and organization as required under the Banking Act.

### (3) Organizational deficiencies

The SFBC Cross-Border Report also referred generally to unclear responsibilities regarding the issuance of internal regulations and the instruction and execution of compliance controls which ultimately was the reason that effective controls were not introduced. With respect to the – partially systematic – violations of the SEC Restrictions prior to the implementation of the US Country Paper (2007), the SFBC noted that management did not pay due attention to the specific legal and reputational risks.

According to the SFBC Cross-Border Report, the deficiencies that came to light during the course of the SFBC investigation had one common denominator: client advisors had been informed by various superiors to be flexible in individual cases and not to lose any clients. Within the North American business, a certain culture of ignoring and ignorance was therefore observed. Equally, as a general rule, there was no willingness to take appropriate measures to ensure compliance in day-to-day business operations.

Pursuant to the SFBC Cross-Border Report, the fact that client advisors were appraised mainly on the basis of the "Net New Money" criterion, as part of a new remuneration model, equally played a role. In the allocation of performance-based remuneration, this criterion was given excessive importance considering the practical impact of the Net New Money goal on the US cross-border business, inasmuch as it was only possible to achieve this objective by circumventing the restrictions that prohibited the client advisor from contacting his clients. While this problem was known to those responsible for the North America business, the top management of the Wealth Management and Business Banking division remained unaware of it due to insufficient supervisory procedures.

### c) Responses to the questions investigated

In summary, the SFBC answers the questions raised in its report as follows:

1. *Did UBS or employees of UBS actively participate in tax fraud committed by their clients?* The SFBC Cross-Border Report concludes that this cannot be excluded. It states that individual employees of UBS assisted US clients in the setting up of domiciliary companies for the purpose of enabling these US clients to hold US securities without submitting an IRS Form W-9, by which they would have been consenting to the declaration of their income to the IRS. This was not compatible with the terms of the QI Agreement. However, the SFBC Cross-Border Report also states that a final determination is possible only on the basis of a detailed analysis of the

III. US cross-border wealth management business

conduct of the respective client advisors in conjunction with a review of their compliance with the applicable provisions of US tax law.

2. *Did UBS, within the scope of its obligations as a QI or otherwise, submit false declarations or reports to the American authorities?* The SFBC Cross-Border Report establishes that in certain cases in which US taxpayers chose structures involving domiciliary companies that should have been treated as "Flow-Through Structures" (and not as "Non-Flow Through Structures"), UBS, due to the particular circumstances, accepted an IRS Form W-8BEN submitted by the domiciliary companies instead of treating the US individual behind the structure as the beneficial owner for US tax purposes and reporting the individual to the IRS.

3. *Did UBS violate the QI Agreement and if so, how serious were these violations?* The SFBC Cross-Border Report establishes that violations of the QI Agreement did take place in connection with the transfers to newly established sham non-US domiciliary companies of US clients and with the restructuring of such companies. Furthermore, there were violations in cases in which, as a result of the direct contact between the US client, who was the beneficial owner, and the client advisor, the good faith of the bank with respect to the accuracy of the Form W-8BEN provided by the domiciliary company was destroyed.

4. *How did UBS and its employees deal with the legal risks resulting from the cross-border business in the US in connection with the QI Agreement?* The SFBC Cross-Border Report observes that the bank was increasingly aware of the legal and reputational risks associated with the US cross-border business. While ever more restrictive measures to minimize these risks were taken, it is clear, in retrospect, that they were taken too late and their implementation was not sufficiently consistent. At least for a certain time it was known at higher management levels that there were instances of non-compliance with the SEC Restrictions, which were seen as a temporary irregularity in need of remedy. Ultimately, however, this state of non-compliance lasted for a long time.

Furthermore, the management responsible for US cross-border business accepted violations in connection with the implementation of the QI Agreement but took no action to report these legal and reputational risks to the supervising bank management.

### d) Measures taken by the SFBC
The SFBC decided not to take measures against members of top management (so-called "fit and proper guarantors"). The SFBC order held that the serious deficiencies must be attributed to conduct by individual employees below the functional levels of top management. The highest corporate bodies were not aware of this conduct. In particular, the SFBC investigation did not reveal any indication of circumstances which would justify the issuing of a formal reprimand against responsible directors or officers individually or which would justify the taking of further supervisory measures. The fit and proper status of these persons was not questioned.

As regards UBS as an institution, the SFBC order states that the seriousness of the deficiencies discovered in connection with risk management and risk control justified the issuance of a formal declaration to this effect.

The SFBC order prohibited UBS from continuing to provide services to US taxpayers who did not submit an IRS Form W-9, and ordered that these client relationships be terminated as quickly as possible.

Further, UBS was placed under an obligation to adequately determine and record the legal and reputational risks when providing cross-border financial services from Switzerland. The measures implemented were to be reviewed by an independent third party by means of an audit conducted on behalf of the SFBC at a later point in time.

### 2. Investigations by the US authorities

The DoJ and the SEC have raised a number of allegations concerning the conduct of the US cross-border wealth management business and have carried out investigations into UBS from the point of view of US law. The US authorities used as the basis of their allegations documents which they had obtained from UBS, via the Swiss authorities, by way of administrative assistance, their own investigations, including interviews with Bradley Birkenfeld, Martin Liechti and other employees of UBS, and the Wachtell Report. Based on the results of their investigations, the DoJ and the SEC have come to the conclusion that, in UBS's US cross-border wealth management business, a series of mistakes were made. In the settlement with the DoJ, UBS expressly accepted responsibility for these mistakes in a "Statement of Facts". In summary, the "Statement of Facts" contains the following:

*From 2001 through 2007, UBS Private Banking employees traveled to the US to meet US persons resident there, and communicated with such persons with the aid of "US Jurisdictional Means" with respect to their (undeclared) accounts. They did so irrespective of the fact that certain US clients had chosen not to provide UBS with a form W-9 with respect to their UBS accounts and thereby concealed such accounts from the IRS.*

*In the same period, UBS employees contributed toward the US losing out on income tax by actively assisting or otherwise facilitating US taxpayers to conceal assets. In particular, the UBS employees arranged in individual cases for accounts to be opened by an offshore company, allowing such US taxpayers to evade reporting requirements and to trade and remain invested in US securities.*

*In connection with the establishment of such offshore companies, UBS employees accepted, in particular, forms W-8BEN provided by the directors of the offshore companies which represented under the penalty of perjury that such companies were the beneficial owners, for US federal income taxes, of the assets in the UBS accounts. In certain cases, the forms W-8BN were false or misleading in that the US taxpayer who owned the offshore company actually directed and controlled the management and disposition of the assets in the company accounts and/or functioned as the beneficial owner of such assets in disregard of the formalities of the purported corporate ownership.*

*Despite the fact that UBS was aware of the violations both of duties under the QI Agreement and of US regulations, these activities continued because of the profitability of the US cross-border business. It was for this reason that the decision to exit this business was only taken in August 2007. The implementation of such decision was further delayed.*

*An additional factor abetting violations of US regulations was UBS business unit "Wealth Management International" changing its compensation approach to take account of a number of factors, including new net money, which provided incentives to expand the size of the US cross-border business.*

*The employees working in Zurich, Geneva and Lugano who were responsible for the US cross-border business had contact with and serviced their US clients primarily during business trips to the US. They traveled to the US an average of two or three times per year, in trips that generally varied in duration from one to three weeks, and generally tried to meet with up to five US clients per day. On these business trips, they used encrypted laptop computers. While in Switzerland, they would communicate via telephone, fax, mail and/or e-mail with their US clients.*

*In the period between 2000 and 2007 UBS's US cross-border business provided financial services to approximately 11,000 to 14,000 US clients who had chosen not to provide a form W-9 or who were the underlying beneficial owners of offshore companies that maintained accounts with UBS. The US cross-border business of UBS generated approximately 120 to 140 million dollars in annual revenue for UBS and was a relatively very small part of UBS Global Wealth Management.*

*As certain US clients indicated that they wanted to continue to maintain their US securities holdings and not provide UBS with a form W-9 on behalf of the IRS, UBS issued written guidelines advising employees in the US cross-border business not to actively assist US taxpayers who may seek to establish domiciliary companies, and that any such companies should respect corporate formalities and not be operated as a sham. UBS internal documents also noted that active assistance by UBS employees to help US clients set up domiciliary companies to evade provisions of the QI Agreement might be viewed as actively helping such clients to engage in tax evasion. Notwithstanding those guidelines, certain managers in the US cross-border business thereafter authorized UBS employees to refer the US clients who did not wish to comply with the new requirements of the QI Agreement to certain outside lawyers and consultants, and did so with the understanding that these outside advisors would help such US clients form offshore companies for the purpose of tax evasion. UBS, through such referrals, indirectly assisted such US clients in creating and maintaining sham domiciliary companies. This enabled such clients to conceal their investments in US securities and thereby evade UBS's obligation to provide tax information reporting and to backup withhold with respect to certain payments made on such accounts.*

*In the period from 2000 through 2007, UBS adopted a series of compliance initiatives that were intended to improve compliance by the US cross-border business with the QI Agreement. In particular, UBS adopted written policies regarding the proper handling of accounts for domiciliary companies beneficially owned by US persons. It also took measures to prevent the provision of financial services in the US or with the assistance of "US Jurisdictional Means". However, UBS did not develop and implement an effective system of supervisory and compliance controls to prevent and detect violations of its policies. UBS failed to monitor and control the activities of certain of its employees, and as a result, some of these employees came to believe that a certain degree of noncompliance with UBS policies was acceptable in connection with operating the US cross-border business. Moreover, owing to the lack of corresponding monitoring measures, UBS was not able to determine the cases in which tax information reporting and backup withholding for payments would have been required.*

*The internal investigation had only a limited scope and did not follow up on available evidence. As a result, only isolated instances of noncompliance were detected, which could have been avoided if a comprehensive investigation (rather than one with a limited scope) had been conducted.*

*Source: Statement of Facts*

The allegations by the SEC involving UBS are set out in the "Complaint" lodged by the SEC. The statement of facts in the SEC action against UBS is worded similarly and in part identically to the "Statement of Facts" in the DoJ action, which UBS acknowledged as part of the settlement of the DoJ investigation.

On 18 February 2009, the proceedings by the DoJ and SEC against UBS were concluded by means of a comprehensive settlement. This settlement included the conclusion of the already mentioned "Deferred Prosecution Agreement (DPA)" with the DoJ and the consent of UBS to a so-called Final Judgment by the competent court in the SEC procedure (SEC Consent Order).

In the framework of these settlements, UBS has essentially undertaken the following:

– to pay a total amount of 780 million US dollars;
– to complete its exit from the US cross-border business;
– to introduce an effective control program with respect to compliance with the obligations under the QI Agreement;
– to increase the independence of the legal and compliance functions, in particular with respect to promotion and compensation issues.

UBS also undertook, in compliance with an order addressed to UBS by FINMA in light of the threat of a criminal indictment in the US, to surrender information regarding account relationships of certain US clients.

An important component of the DPA was the DoJ's agreement to defer prosecution of any claim against UBS for a period of at least 18 months subject to certain conditions. If UBS properly fulfills all obligations under the DPA, the DoJ will ultimately dismiss with prejudice all possible claims.

Not covered by the settlements were the civil proceedings – the so-called "John Doe Summons" which had been initiated by the IRS, by which the IRS sought to obtain account documentation of all US taxpayers with account relationships with UBS in Switzerland. In August 2009, these proceedings were resolved by way of international agreements between the Swiss and US governments, and a related mutual administrative assistance agreement between the US, Switzerland and UBS AG.

# D. What steps has UBS taken to ensure that the problems do not recur?

Beginning in the spring of 2008, UBS implemented comprehensive and far-reaching measures to ensure that the problems arising from the cross-border wealth management business would not recur in the future. It did this on four levels:

First, UBS completed its exit from the US cross-border business and introduced processes and monitoring systems in order to ensure that UBS consistently complies with US law with respect to all transactions with clients with links to the US. A US law firm continuously monitored the progress of the implementation of these measures, with the assistance of the auditing company KPMG, for the period of one year. The law firm recently confirmed in a comprehensive report to the SEC and the DoJ that implementation had been successfully completed.

Second, in the framework of an extensive project, UBS identified the risks arising out of the entire cross-border business and introduced numerous far-reaching measures to adequately monitor these risks. Some elements of this program are a direct response to the experience from the various investigations mentioned in this report. Others respond to more recent developments in the regulatory and political environment which affect the entire financial market. The entire cross-border business is currently in a fundamental transformation process. UBS has regularly informed FINMA about the implementation of these measures and FINMA will instruct an independent auditing company in the fourth quarter of 2010 to review the appropriateness and effectiveness of these measures.

Third, UBS has increased the independence of the legal and compliance functions and, fourth, it has introduced an effective monitoring system with respect to the obligations under the QI Agreement which was also reviewed by an independent auditing company, and the successful implementation of which has been confirmed to the DoJ.

## 1. Exit from the US cross-border business / US Settlement Execution Program

To ensure comprehensive and timely compliance with the obligations that it assumed under the DPA and the SEC Consent Order, UBS set up a dedicated project, the US Settlement Execution Program (Settlement Execution Program). The Settlement Execution Program has comprised, at times, more than 100 employees and reported to an Oversight Committee (OC) which was headed by the Group General Counsel and the CEO Wealth Management, both of whom are members of the Group Executive Board. The OC in turn reports to the Risk Committee of the Board of Directors.

The main tasks of the Settlement Execution Program include the execution of the exit from the US cross-border business and the development and roll-out of a policy and control framework in both Switzerland and other UBS locations worldwide to ensure continued compliance with applicable US laws and regula-

tions. Further, the Settlement Execution Program coordinates and exercises oversight with respect to compliance reviews at the Investment Bank and Global Asset Management.

### a) Exit from the US cross-border business

To complete the exit from the US cross-border business, UBS first identified those account relationships that fell within the scope of the DPA and the SEC Consent Order. UBS has engaged in an intensive dialogue over the last twelve months with both the DoJ and the SEC to ensure full agreement with respect to the scope of the exit requirement under the DPA and the SEC Consent Order as well as under US laws. This dialogue led to certain amendments of the DPA and of the SEC Consent Order. On this basis, UBS was able to determine precisely which account relationships it was obliged to terminate and which businesses it was to re-structure in order to become fully compliant with US laws and regulations and guidance received from the SEC.

Second, UBS engaged in a thorough review of tens of thousands of account relationships to ensure that it had identified all those relationships that, according to its legal analysis and agreement with the US authorities, matched the relevant criteria. Where the quality of account data available was not such that a clear determination could be made, UBS engaged in remediation efforts to obtain the information needed to establish with certainty whether specific account relationships had, in fact, to be exited.

By 31 July 2010, the exit program had been largely completed. By that date, UBS was able to terminate approximately 90 percent of all accounts, covering approximately 95 percent of all assets that are subject to the exit. The remainder of the accounts consist mainly of accounts with products that cannot be readily liquidated, such as private equity investments, and, more importantly, accounts for which UBS has not been able to solicit an instruction to terminate the relationship as required under Swiss law. These accounts have been transferred to a special unit and are subject to tight controls.

UBS has also changed the service model relating to certain account relationships or products that are not subject to the exit requirement, in order to ensure full compliance with the SEC Restrictions based on new instructions from the SEC. For instance, based on such guidance, UBS is no longer accepting instructions relating to transactions in US securities from individuals residing in the US that hold a power of attorney over accounts of non-US persons.

### b) Introduction and implementation of US Person Policy and related Compliance Control Framework

In addition to the execution of the exit from the US cross-border business, UBS has issued new instructions and implemented a control framework designed to ensure that UBS does not, in any of its locations, open new accounts for US clients in entities

that are not registered with the SEC. The key elements of this framework include the US Person Policy, mandatory training, client advisor certifications, account documentation requirements, compliance reviews and controls.

The US Person Policy is the core document that sets forth the fundamental rules, including a definition of which customers and services are affected by the DPA and/or the SEC Consent Order and to what extent the SEC Restrictions affect all other account relationships maintained by UBS globally. It further provides that UBS employees are, in principle, prohibited from traveling to the US for the conduct of business, that no communications regarding securities business may be sent to or received from the US, and that all UBS employees with client-facing or immediate supervisory or risk control responsibilities must be regularly trained, tested and certified with respect to the US Person Policy.

A broad range of detailed instructions, procedures and controls have been developed to implement the provisions of the US Person Policy. The key elements are as follows:

– As of November 2010, clients opening an account with UBS will be required to sign a declaration affirming whether they or any beneficial owners of the account are a US national, green card holder or US resident. Account holders must also undertake to inform UBS without delay if their or a beneficial owner's status should change. This measure will ensure that UBS will not open any account without knowing the status of the respective client under US laws.
– To date, over 17,000 employees have completed detailed mandatory training with respect to the implementation of the US Person Policy and procedures relating to the US Settlement Execution Program. Upon completion of the training and test, each such employee must certify that he or she (i) has read and understood the US Person Policy; (ii) will comply with that policy; (iii) acknowledges a continuing responsibility to review all client accounts to ensure that they are correctly coded with respect to US Person status; and (iv) understands that violations of the policy could result in serious disciplinary measures. The training and certification must be repeated by all such UBS employees at two-year intervals.
– Client advisors must also complete due diligence checklists for their clients, both when opening an account and when reviewing existing accounts. The client advisors must make a determination as to whether (i) the client is a US person, (ii) all relevant documentation has been received, and (iii) the client has been properly coded in the bank's systems.
– All direct line managers of client advisors must certify at least yearly that they have verified that all US persons in their area of responsibility have been properly documented and coded. Further they must confirm that all accounts subject to the exit have been transferred to a special unit responsible for terminating such account relationships.

UBS has also established a number of functions that have responsibility for oversight, investigation, review and support in relation to the implementation of the US Person Policy.
– A specialized legal team regularly reviews the US Person Policy framework and provides expert advice with respect to

all matters relating to compliance with relevant US laws and regulations.
– Compliance performs independent periodic reviews of accounts and required documentation and monitors compliance with US business travel and communications restrictions and training, testing and certification requirements. Compliance also regularly reviews files and client forms to identify accounts which may be in violation of the US Person Policy and to institute procedures to transfer or close such accounts.
– The US Competence Center, together with the project office, has a centralized reservoir of data, information and personnel with particular expertise, which maintains bank-wide statistical data on accounts with US Person status and provides assistance with the termination of accounts prohibited by the US Person Policy. The unit provides day-to-day advice on US Person issues and operates a web-based global portal, containing relevant policies and procedures, forms, contact information for relevant personnel, and other pertinent information.

**2. Comprehensive measures to address and control risks associated with the Wealth Management & Swiss Bank cross-border business globally / Cross-Border Business Review Program**

In addition to the measures taken in the US context, UBS embarked on a comprehensive review of all of its international businesses and took a series of additional measures to ensure that it adequately addresses and controls all related legal and reputational risk in all of its cross-border businesses. These reviews and measures involve not only UBS Wealth Management & Swiss Bank, but also other divisions, including Wealth Management US and the Investment Bank. However, given the growing fiscal and economic policy-motivated pressure on cross-border businesses operating out of jurisdictions with increased financial privacy protection, notably Switzerland, and the complexities of the legal and regulatory framework in which the wealth management businesses operate, this report focuses on measures taken in the Wealth Management & Swiss Bank division and its Cross-Border Review Program.

The program aims to review and, where necessary, revise, in consideration of all legal requirements, all instructions and controls applicable to the cross-border wealth management business, to adequately train the employees concerned and to adjust the products & services framework. It envisages a comprehensive treatment of all relevant legal and reputational risks. The program deals not only with business activities abroad, but also with cross-border services provided with "remote means" (i.e. by telephone, mail, fax, e-mail). Further, it (i) addresses compliance with product-specific investment restrictions, licensing requirements and offering rules; (ii) considers corporate tax, payroll tax, and client withholding and information reporting obligations under "permanent establishment" concepts; and (iii) explicitly addresses secondary liability for tax offenses (aiding and abetting, money laundering).

The program is centrally managed and operates along a number of workstreams, notably (1) Policies, (2) Control Framework, (3) Education & Training, (4) Products & Services, (5) Global Financial Intermediaries, (6) Wealth Planning Services, and (7) IT Tools and Processes. The program is under the control of the so-called "Cross-border Commitee", in which all relevant units of UBS Wealth Management & Swiss Bank are represented.

### a) Policies

Failures that occurred in the US cross-border wealth management business demonstrated the importance of a holistic governance, and they underline that the "rules of engagement" need to be clear and realistic. In response to these findings, UBS developed a comprehensive governance and policy framework. The basis thereof is a comprehensive framework policy (Global Cross-border Policy) which is, to the extent necessary, complemented with specific instructions (Supplementary Instructions). In the cross-border business, this policy framework is further supplemented by a number of additional regulations and directives, notably in the area of wealth planning services.

The Global Cross-border Policy describes the basic elements of the overall framework:

– It establishes a Cross-border Committee as the decision-making body for all material cross-border business issues and assigns clear responsibilities for the implementation of the cross-border framework, including regular controls.
– It establishes the requirements for a comprehensive control framework, including independent controls conducted by the responsible persons within the Compliance function.
– It requires that all employees dealing with clients on a cross-border basis be certified in accordance with a mandatory training curriculum, and it provides that employees are not permitted to embark on client-related business travel abroad unless specifically authorized to do so, with such authorization being granted only if the employee is trained and certified.
– It establishes general principles regarding tax and regulatory compliance and sets forth a list of expressly prohibited activities. These principles highlight that while it is generally not UBS's role, nor is UBS in a position, to verify whether clients are in compliance with the relevant tax obligations, employees must not encourage or assist clients in any scheme designed to breach their legal obligations including their tax obligations. These principles are supplemented by a number of activities which likewise are explicitly prohibited.

The Supplementary Instructions cover a number of countries, client segments (e.g. corporate clients), booking centers, and representative and advisory offices. They take the format of detailed "activity and product grids", addressing with specificity real life situations along the "life-cycle" of a client relationship with clear "dos" and "don'ts", covering three different scenarios: (i) the client comes to see the client advisor in the booking center, (ii) the client and the client advisor communicate by telephone, mail, fax or e-mail); and (iii) the client advisor travels to the client's country of domicile.

By the end of 2010, UBS will have completed Supplementary Instructions for 60 countries, covering 90 percent of UBS's client assets. In addition, specific instructions will be prepared for all relevant representative offices and a number of client segments.

### b) Controls

One of the most important lessons learned in connection with the US cross-border wealth management business was the importance of effective compliance control processes. As a consequence, UBS has developed and implemented a comprehensive Cross-border Control Framework to support the enforcement of the Cross-border Policy. This consists of primary controls performed by the front office, IPS and other front facing functions together with independent controls undertaken by Legal & Compliance.

Controls have been designed and implemented in, among others, the following areas and issues: (i) travel (approval and pre- and post-trip briefing), (ii) training and certification of employees, (iii) remote communication, (iv) compliance with country-specific restrictions in terms of products and services offered, (v) dealings with external asset managers (FIMs), and (vi) activities of foreign representative offices. The results of these controls are regularly reported to senior management.

A key topic in this area is the control of cross-border travel activities. For this purpose, UBS has developed a so-called "Travel Approval & Control Tool (TRACT)" which not only supports the approval process but equally secures compliance with training requirements and facilitates independent controls by Compliance.

UBS will continue to develop the control framework to meet changing cross-border demands and to ensure that the key risks of its cross-border business are actively and effectively monitored. UBS will take disciplinary measures to sanction any failures to comply with these requirements.

### c) Education and training

As the rules applicable to the cross-border business are complex, UBS puts special emphasis on providing its employees with a training framework to ensure that they know and understand these rules. The education framework that has been developed includes the following main elements:

– A mandatory general web-based training is designed to assist employees to understand and familiarize themselves with the Cross-border Policy. To date, this training has been successfully completed by over 17,500 employees globally.
– Mandatory country-specific web-based training programs are based on the Supplementary Instructions and cover, in detail, the specific rules and regulations applicable to a specific country. Country-specific web-based training programs are now available for 28 countries, and they have been completed by more than 6,000 client-facing employees.
– Classroom desk head training programs ensure that desk heads fully understand their responsibility as supervisors of client advisors and enable desk heads to coach their teams and ensure proper implementation of the policy framework. To date, these mandatory training programs have been completed by over 650 desk heads.

### d) Products and services

The Products & Services workstream is a response to the ever-increasing body of regulations in the cross-border business. It deals with product-specific investment restrictions, licensing requirements, offering and reporting rules applicable in the cross-border wealth management business and which, in UBS's view, will be of growing significance. On the basis of a detailed analysis of all applicable rules and regulations, the need for adjustments to product offerings is identified, and the required adjustments are implemented in order to ensure compliant product offerings in each country on an ongoing basis.

Given the complexity of the subject, efforts in developing a comprehensive locally compliant product shelf have been focused on a number of key markets. The product shelf analysis for remaining important countries will be concluded in the course of 2011. UBS has decided to support the implementation of these country-specific product rules by developing an appropriate IT tool for use by client advisors.

### e) FIM business

The business with external asset managers and financial consultants (so-called "Financial Intermediaries", or "FIMs") is likewise the subject of the Cross-border Business Review Program. In this business, particular risks arise from the fact that this relationship consists of three parties (UBS, the FIM and the end-customer), and more in particular from the fact that contacts with the end-customer (whose assets are deposited with UBS) take place almost exclusively between the FIM and the end-customer. To address these risks, UBS has introduced the Global FIM Control Framework, the main pillars of which are as follows:

- a global Policy on Financial Intermediaries which defines minimum standards for the business. Importantly, UBS does not maintain relationships with FIMs that are non-operating companies or that are not properly licensed as required by local laws and regulations;
- booking center specific rules improve the due diligence process concerning the FIMs (background checks, examination of their licenses and internal rules regarding travel activities, etc.) before business relationships are entered into with the respective FIM.

In addition, UBS has started to roll out revised and enhanced contractual agreements (Framework Agreement Intermediaries) to further clarify the FIMs' responsibility as an independent manager with regard to clients. UBS will also organize so-called "awareness days" on cross-border topics for FIMs in order to assist them in understanding the complexities and challenges of engaging in cross-border business activities.

### f) Wealth planning services

Unrelated to the US cross-border wealth management issue, UBS is reviewing its own offering in the area of wealth planning services. Wealth planning structures have been identified by fiscal authorities as "red flags" for activities which are considered as open to misuse in certain circumstances. UBS has taken a number of measures to address these concerns.

UBS is of the firm view that there are many legitimate reasons why high net worth clients might wish to take advantage of wealth planning services and these remain a very important element of UBS's wealth management services offering.

The new rules and regulations provide that UBS will no longer provide trusts, foundations and life insurance policies to its clients where client advisors have knowledge, or reasons to suspect, that the product is to be used as a means to enable the beneficial owner to commit a tax offense or otherwise breach relevant regulations.

Further, clients have to confirm, when seeking UBS's wealth planning services, that UBS does not provide advice with respect to foreign tax laws and that they have obtained independent legal, tax and other professional advice as appropriate and necessary.

In the view of UBS, the above measures appropriately protect the legitimacy of the services offered and the position of clients requesting them.

### g) Further measures

Given the complexities of the cross-border servicing requirements and the resultant challenges that arise for its employees, UBS has decided that, wherever possible, international clients should be served by units specializing in the client's country of residence. This country-specific segmentation will not only improve the quality of the services offered to the clients, but equally improves the ability of the client advisors to apply the rules, as they will be able to focus on one country, or a small number of countries, thereby mitigating risks and strengthening control capabilities. This country-specific segmentation is currently being handled by a dedicated project, covering all major markets, including foreign clients with accounts maintained in UBS's Swiss branch offices.

## 3. Changes to the governance of Legal & Compliance

In recognition of the importance of the full independence of the Legal & Compliance function, UBS has centralized the reporting lines within the Legal & Compliance function under the leadership of the Group General Counsel. This also applies to the members of the compliance function who are responsible for the independent controls within the wealth management business. These newly centralized reporting lines to the Group General Counsel are designed to ensure that legal advice and the execution of controls are immune to attempts to exercise undue influence on the part of those reponsible for the businesses under review.

Crisis management and reorganization processes were accompanied by a reinforcement of the legal and compliance functions on all levels. This provides more flexibility to the Group General Counsel in supporting the cultural changes currently underway within UBS.

Further, UBS has revised the framework for remuneration and promotion matters relating to Legal & Compliance personnel, taking into account the independence requirements applying to a control function. Under the revised framework, the bonus pool is allocated in aggregate to the group general counsel who then, in turn, allocates to his direct reports who pro-

pose individual salaries and bonuses. The Group General Coun-
sel retains the final authority with respect to compensation and
promotion of Legal & Compliance personnel, and neither divi-
sional management nor anyone else outside of Legal & Compli-
ance has the authority to override the Group General Counsel's
final authority on these matters.

UBS has also reorganized its compliance function. A Global
Head of Compliance was appointed with a mandate to define
the overall compliance strategy for all business divisions and
regional units, ensure that systemic and significant issues are
identifed and addressed and that adequate compliance-related
processes, policies and procedures are in place and provide con-
sistency across all businesses. Under this reorganization, a num-
ber of functional teams were established to enhance group-
wide recognition and control of specific risks. A central
compliance function was established to deliver global compli-
ance processes.

## 4. Improvement of governance and of the control program relating to the implementation of the QI Agreement

In order to meet various commitments UBS has made under the
DPA, UBS has also strengthened its governance and the control
program in relation to its obligations under the QI Agreement:
– First, UBS introduced serveral new functions and staffed
  them with specialized personnel, such as the position of a
  Group Head US Withholding and QI Compliance and of a QI
  Tax Coordinator.
– Second, UBS has enhanced its written policies and proce-
  dures to reinforce various aspects of QI compliance. In par-
  ticular, with respect to client documentation requirements,
  UBS policies and procedures go beyond the requirements of
  the QI Agreement.
– Third, UBS has strenghtened various controls to prevent, de-
  tect, and correct material failures under the QI Agreement.
– Fourth, UBS has improved and intensified training of rele-
  vant personnel on various QI requirements.

The implementation of the steps described above was con-
firmed by the independent audit firm KPMG in a 49-page re-
port to the DoJ, dated 16 June 2010.

# Glossary

Source: certain of the following explanations have been taken from the FINMA report published on 14 September 2009, "Financial market crisis and financial market supervision".

| Term | Definition |
|---|---|
| **Asset-backed security (ABS)** | Security similar to an obligation which is backed by a pool of financial assets (e.g. mortgage or consumer loan receivables). The issuer can use them as security for loans. The investor receives a coupon. |
| **ABS/MBS desk** | Business unit within the UBS Investment Bank that dealt with ABS and MBS. |
| **Asset and Liability Committee (ALCO)** | Senior-management committee of the UBS group dealing with borrowing limits and financing questions. |
| **Backup Withholding Tax** | A US tax required to be withheld at source [withholding tax], currently at the rate of 28 percent, on certain payments in the event that the payee fails to provide the so-called "Withholding Agent" with its US taxpayer identification number or to establish that it is exempt from backup withholding. |
| **Bär & Karrer** | Bär & Karrer AG is a Swiss law firm domiciled in Zurich. |
| **Beneficial owner** | In German: Wirtschaftlich Berechtigter. |
| **BUC** | "Business Unit Control" – UBS organizational unit responsible for risk control prior to the financial market crisis. |
| **CCs** | Control Committees of the National Council and the Council of States. |
| **CDO desk** | Business unit within UBS Investment Bank that dealt with CDOs. |
| **Chairman's Office** | (Former) committee composed of the Chairman and Vice Chairman/Chairmen of the UBS Board of Directors. |
| **Chief Risk Officer (CRO)** | Highest ranking risk manager within UBS (at divisional or group level). |
| **Collateralized debt obligation (CDO)** | Bond backed by a diversified debt portfolio. As a rule a CDO bond is divided among various tranches with different credit ratings. CDO is also the umbrella term for Collater-alized Loan Obligations (CLOs), Collateralized Bond Obligations (CBOs) und Collateralized Swap Obligations (CSOs). |
| **Complaint** | Statement of claim by the SEC against UBS of 18 February 2009. |
| **Consent** | Acknowledgement by UBS by way of a settlement of the decision by the competent court in the proceedings filed by the SEC as part of the settlement reached with the SEC on 18 February 2009. |
| **Country Paper USA (2004)** | A document made available on the intranet to UBS personnel, from 2004 onwards, in which the principles for the correct implementation of the rules applicable to the US cross-border business were set forth. |
| **Country Paper USA (2007)** | A revised version of Country Paper USA (2004), made available to UBS personnel from 2007 onwards. |
| **Credit Fixed Income** | Business unit within UBS Investment Bank. |
| **Deferred Prosecution Agreement (DPA)** | Agreement reached with the DoJ as part of a settlement concluded between UBS AG and the DoJ on 18 February 2009, according to which the DoJ, subject to certain conditions precedent, agreed to defer prosecution of UBS AG for at least 18 months and to waive such prosecution definitively in the event that all obligations under the DPA were fulfilled. |
| **Dillon Read Capital Management (DRCM)** | Former independent subsidiary of UBS, that was intended to serve as a platform for alternative investment strategies and was expected, in that context, to develop alternative investment vehicles (hedge funds), in particular for investments in the US mortgage market. |
| **DoJ** | United States Department of Justice. |
| **DTT** | Double Taxation Treaty. |
| **Federal Reserve (Fed)** | Central bank of the USA. |
| **FINMA – Swiss Financial Market Supervisory Authority** | As of 1 January 2009, Switzerland's financial market supervisory authority, headquartered in Bern. Its supervisory activities extend to all branches of the finance industry (banks, insurance companies, stock exchanges, securities dealers, collective capital investment schemes, and auditors). |
| **Fixed Income, Rates and Currencies** | Business unit within UBS Investment Bank, dealing with fixed income products. The term fixed income products refers to securities that pay a set rate of interest, fixed in advance, or coupon rate (e.g., bonds or other debt securities) and thus are intended to guarantee a consistent rate of interest. Because of price fluctuations, however, the overall return on investments in this category may vary over time. |

| | |
|---|---|
| **Foreign Exchange/Cash Collateral Trading (FX/CCT)** | Business unit within UBS Investment Bank that was responsible for assuring the liquidity of the UBS business units in all divisions of the UBS group. |
| **FTA** | Swiss Federal Tax Administration. |
| **Group Internal Audit (GIA)** | UBS internal audit. |
| **Hedge funds** | Generic term for investment vehicles that follow non-traditional investment strategies. Hedge funds invest in the global markets using special investment strategies that offer the chance of high returns with corresponding risks. Because they often act in the capital markets as the counterparty in hedging transactions involving derivatives, they have come to be referred to as hedge funds. |
| **Homburger** | Homburger AG is a Swiss law firm domiciled in Zurich. |
| **Income notes** | Securities which, within the structure of a CDO, are the first to bear the default risk. These notes are assorted with the highest risk, but also yield the highest returns. |
| **IRS** | Internal Revenue Service, the US tax authority. |
| **IRS Form W-8BEN** | IRS form on which a non-US person certifies that it is the beneficial owner of an item of income for US withholding tax purposes. Form W-8BEN is also used to claim benefits under applicable US income tax treaties. |
| **IRS Form W-9** | IRS form on which a US person certifies its taxpayer identification number. |
| **Leverage ratio** | The term leverage is used in finance to refer to the use of borrowed funds to optimize return on equity. In connection with the accounting and regulation of financial institutions, the leverage ratio is used to indicate the relationship between a company's equity capital and its debt/adjusted balance sheet total. |
| **Mandatory convertible note** | A note is a debt security issued on large commercial loans, normally divided into sub-categories, each with its own conditions attached (interest rate, maturity, etc.). Where the note is issued as a mandatory convertible note, the creditor receives repayment of his loan in the form of shares in the company to which the loan was made. |
| **Mortgage-backed security (MBS)** | Security similar to an obligation which is backed by a pool of mortgage receivables (securitized building mortgages). The issuer can use them as security for loans. The investor receives a coupon. |
| **Net New Money** | New influx of net assets. |
| **Net revenue** | Net revenue (revenue following deduction of expenses incurred in generating the revenue). |
| **Non-recourse loans** | Mortgage loans under the terms of which the borrower's liability is limited exclusively to the property on which the mortgage was granted. |
| **Non-Resident Alien (NRA)** | Person not subject to US taxes. |
| **Onshore business** | Wealth management business conducted by UBS with US clients, in which the client accounts are located in the US and the clients are advised locally in the US. |
| **Origination and underwriting** | Business involving the acquisition, bundling and resale of investment products. |
| **Paying Agent** | Person that makes payments of dividends, interest or sales proceeds. |
| **Prime mortgage** | Mortgages in which the borrower is deemed to have a high level of creditworthiness. |
| **Qualified Intermediary (QI)** | Qualified (foreign) financial institution. |
| **Qualified Intermediary Agreement (QI Agreement)** | A standardized contract prepared by the IRS, which foreign financial institutions (including foreign banks) may conclude with the IRS. The QI Agreement imposes wide-ranging documentation, reporting and withholding obligations on a foreign financial institution. |
| **Rating agencies** | Agencies that measure the creditworthiness of borrowers or investments and rate them accordingly, by assigning them a specific note (e.g., AAA, B+, etc.).<br><br>Credit rating agencies such as Standard & Poor's classify investment products according to creditworthiness into categories ranging between AAA (highest creditworthiness) and D (bankrupt). The intermediate rating levels (AA+, AA, AA–, A, BBB, BB, B, etc.) provide information on the presumed risk of default. Investments with a creditworthiness of BBB– or higher are designated as high-quality investment products ("investment grade"), and investments with a creditworthiness of BB+ or less as speculative securities ("speculative grade").<br><br>Other credit rating agencies, such as Moody's and Fitch, use similar measurements. In the interest of simplicity, this report only refers to the rating levels used by Standard & Poor's. |

Glossary

| | |
|---|---|
| **Remediation Plan** | "UBS's Write-Downs Arising from the Market Dislocation: Lessons Learned and Remediation", report issued by UBS on 6 June 2008. |
| **Renewal Plan** | "UBS Plan for Risk Management & Control Renewal", dated 3 September 2008. |
| **Revised Business Model** | The UBS AG business model introduced in 2002, the goal of which was to channel existing business relationships with US clients into asset management agreements and to prohibit contacts with US clients using "US Jurisdictional Means". |
| **SEC Restrictions** | Various US statutes and regulations issued on the basis thereof, which restrict the providing of cross-border securities-related services in the US or otherwise using "US Jurisdictional Means". |
| **Securities and Exchange Commission (SEC)** | US financial market supervisory authority. |
| **Securitization** | Securitization involves the transfer of certain assets by the seller, usually to a special purpose vehicle (SPV), which in turn refinances itself by issuing securities backed by the original assets (see asset-backed security). |
| **Securitized Product Group Proprietary Trading Desk** | Business unit within the UBS Investment Bank, which engaged in proprietary investments in structured products. |
| **SFBC UBS Subprime Report** | Report by the SFBC, "Subprime Crisis: SFBC Investigation Into the Causes of the Write-downs of UBS AG", issued on 30 September 2008. |
| **SFBC Cross-Border Report** | "UBS's cross-border business with private clients in the USA – Report by the SFBC on the implementation of the Qualified Intermediary Agreement and on cross-border services of the UBS AG in the USA", issued on 17 December 2008. |
| **SFBC order** | Order issued by the SFBC on 21 December 2008 in the matter of the UBS AG cross-border business with private clients in the US. |
| **SIX Swiss Exchange (SIX)** | The SIX Swiss Exchange is Switzerland's stock exchange. As such it runs several trading platforms and is the marketplace for various securities sectors (Swiss stocks, bonds denominated in Swiss francs, etc.). As part of the regulatory duties provided for in the Stock Exchange Act, SIX determines the requirements for meeting and maintaining the listing qualifications. |
| **Special purpose vehicle (SPV)** | An SPV is a legally and economically independent vehicle established for a specific purpose. It may, for example, be established as part of a securitization transaction for the purpose of acquiring certain receivables and generating the required funds by issuing securities. The SPV has no access to the assets, so that the receivables acquired serve in their entirety as security for the investors. |
| **StGB** | Swiss Criminal Code (Strafgesetzbuch). |
| **Stress test** | Analysis of loss potential, intended to provide information as to the earnings and solvency situation of a financial institution in a number of possible scenarios. Stress tests are often carried out by individual institutions as well as by supervisory authorities and central banks. |
| **Subprime** | "Subprime" mortgages refer to mortgage loans which are provided to consumers with a low credit rating (borrower quality) or low financial assets. |
| **Subprime securities** | Securities for which the underlying consists of loans or mortgages granted to borrowers with limited or insufficient creditworthiness. |
| **Super senior** | With regard to asset-backed securities or CDOs, a super senior tranche is a securitization tranche that ranks below a senior tranche (usually AAA rating) in terms of loss absorption. A super senior tranche thus has an even lower default risk than a senior tranche. |
| **Swiss Federal Banking Commission (SFBC)** | Former supervisory authority over banks and securities dealers in Switzerland; its functions were assumed by the newly created Swiss Financial Market Supervisory Authority (FINMA), effective 1 January 2009. |
| **Swiss National Bank (SNB)** | The central bank of Switzerland, responsible for the Confederation's monetary and currency policies. |
| **UBS** | UBS AG. |
| **UBS Shareholder Report** | "Shareholder Report on UBS's Write-Downs" issued by UBS on 18 April 2008. |
| **UBS Swiss Financial Advisors AG (UBS SFA AG)** | A UBS subsidiary, founded in 2005, which (in contrast to UBS AG) was licensed as a securities dealer in the USA. |
| **UBS Report to the SFBC** | "Preliminary Report on UBS's Write-Downs Arising from the Market Dislocation" issued by UBS on 4 April 2008. |

| **US cross-border business** | Wealth management business conducted out of Switzerland by UBS AG with US clients who maintained an account relationship with a UBS office located outside the US. |
| **US Jurisdictional Means** | Included therein are, for example, all communications to or from the US by means of e-mail, telephone, telefax or the postal service. |
| **Value-at-risk** | Statistical measure of risk that is often used in the financial sector to assess possible losses. VaR indicates the loss threshold that a risk position, with a certain degree of probability (confidence level), will not exceed within a given time horizon. For example, VaR of 100 million francs for a risk position with a ten-day holding period and a confidence level of 95 percent indicates that there is a 5 percent likelihood of it generating losses greater than 100 million francs over the next ten days. |
| **Wachtell** | US law firm Wachtell, Lipton, Rosen & Katz. |
| **Wachtell Report** | Report by Wachtell issued on 14 October 2008. |
| **Withholding Agent** | Paying Agent with a duty to render account to the IRS concerning income earned on US securities by a person subject to US taxes, in keeping with reporting requirements, stating the identity of the individual taxpayer or his tax identification number. |
| **WM & BB** | Wealth Management & Business Banking. |

| | |
|---|---|
| **Federal Reserve (Fed)** | Notenbank der USA |
| **Fixed Income, Rates and Currencies** | Geschäftseinheit innerhalb der Investmentbank der UBS, die mit Fixed-Income-Produkten arbeitet. Als Fixed-Income-Produkte werden Effekten bezeichnet, die einen im Voraus fest vereinbarten Zinssatz resp. Coupon haben (z.B. Anleihen oder Obligationen) und somit eine konstante Zinshöhe garantieren sollen. Infolge von Kursschwankungen kann sich jedoch die Gesamtrendite dieser Investmentkategorie im Zeitverlauf verändern. |
| **«Flow-through»-Gesellschaften** | Gesellschaftsstrukturen, bei denen die von diesen Gesellschaften gehaltenen Vermögenswerte für die Zwecke des US-Steuerrechts den dahinterstehenden wirtschaftlich berechtigten Privatpersonen zugerechnet werden. |
| **Foreign Exchange / Cash Collateral Trading (FX / CCT)** | Geschäftseinheit innerhalb der Investmentbank der UBS, die für sämtliche Bereiche des UBS-Konzerns für die Sicherstellung der Liquidität der Geschäftseinheiten der UBS zuständig war. |
| **Formular W-8BEN** | Ein von Nicht-US-Steuerpflichtigen zu unterzeichnendes Formular, worin diese unter Strafandrohung bestätigen, dass sie selbst der sog. «Beneficial Owner» an den Vermögenswerten auf dem entsprechenden Konto/Depot sind. |
| **Formular W-9** | Ein von US-Steuerpflichtigen zu unterzeichnendes Formular, worin diese dem QI ihre US-Steuernummer mitteilen und der Offenlegung ihrer Identität gegenüber dem IRS zustimmen. |
| **GPK** | Geschäftsprüfungskommissionen des National- und Ständerates |
| **Group Internal Audit (GIA)** | Interne Revision der UBS |
| **Hedge Funds** | Oberbegriff für Anlagevehikel, die nichttraditionelle Anlagestrategien verfolgen. Hedge Funds investieren mit speziellen Anlagestrategien an den globalen Märkten und bieten bei entsprechenden Risiken die Chance auf hohe Renditen. Sie stellen oftmals am Kapitalmarkt die Gegenpartei für Absicherungsgeschäfte mittels Derivaten (Hedge), woraus ihre Bezeichnung Hedge Funds abgeleitet worden ist. |
| **Homburger** | Homburger AG ist eine schweizerische Anwaltskanzlei mit Sitz in Zürich. |
| **IRS** | Internal Revenue Service (US-amerikanische Steuerbehörde) |
| **Länderpapier USA (2004)** | Ein den Mitarbeitern der UBS ab 2004 auf dem Intranet zur Verfügung gestelltes Dokument, in dem die Grundsätze für die korrekte Handhabung der anwendbaren Regeln im US-Crossborder-Geschäft festgehalten wurden. |
| **Länderpapier USA (2007)** | Eine überarbeitete Version des Länderpapiers USA (2004), das den Mitarbeitern der UBS ab 2007 zur Verfügung gestellt wurde. |
| **Mortgage-Backed Securities (MBS)** | Obligationsähnliche Wertpapiere, die durch einen Pool von Forderungen aus dem Hypothekarbereich gedeckt sind (verbriefte Immobiliendarlehen). Der Emittent kann sie als Sicherheiten für Kredite einsetzen. Der Investor erhält einen Coupon. |
| **Net New Money** | Neugeldzufluss |
| **«Non-flow-through»-Gesellschaften** | Gesellschaftsstrukturen, bei denen die von diesen gehaltenen Vermögenswerte für die Zwecke des US-Steuerrechts nicht dem dahinterstehenden wirtschaftlich Berechtigten zugerechnet werden. |
| **Non-Recourse Loans** | Hypothekardarlehen, bei der der Darlehensnehmer ausschliesslich mit dem Grundstück, für das das Darlehen ausgerichtet wurde, haftet. |
| **Non-Resident Alien (NRA)** | Nicht US-steuerpflichtige Person |
| **Offshore-Geschäft** | Vermögensverwaltungsgeschäft der UBS mit Kunden, bei dem die Konten von einer Niederlassung der UBS ausserhalb des Wohnsitzlandes der Kunden betreut werden. |
| **Onshore-Geschäft** | Vermögensverwaltungsgeschäft der UBS mit Kunden, bei dem die Konten von einer Niederlassung der UBS innerhalb des Wohnsitzlandes der Kunden betreut werden. |
| **Origination and Underwriting** | Geschäft, das sich mit dem Ankauf, der Bündelung und dem Weiterverkauf von Anlageprodukten befasst. |
| **Pflichtwandelanleihe** | Eine Anleihe ist ein Grossdarlehen zugunsten einer Gesellschaft, das in der Regel in Teilbeträge mit einheitlichen Bedingungen (Zinssatz, Laufzeit usw.) aufgeteilt wird. Ist die Anleihe in Form einer Pflichtwandelanleihe ausgestaltet, bekommt der Gläubiger sein Darlehen in Form von Aktien der Gesellschaft zurückbezahlt. |



UBS AG
P.O. Box, CH-8098 Zurich
P.O. Box, CH-4002 Basel

www.ubs.com

Glossar

| | |
|---|---|
| **Prime-Hypotheken** | Hypotheken, bei denen der Darlehensnehmer mit einer guten Bonität bewertet wird. |
| **Qualified Intermediary (QI)** | Qualifiziertes (ausländisches) Finanzinstitut |
| **Qualified Intermediary Agreement (QI Agreement)** | Ein vom IRS ausgearbeiteter Standardvertrag, den ausländische Finanzinstitute, insbesondere ausländische Banken, mit dem IRS abschliessen können. Das QI Agreement überbindet den Vertragspartnern des IRS weitreichende Dokumentations-, Melde- und Quellensteuererhebungspflichten. |
| **Qualified Intermediary System (QI-System)** | System zur Sicherstellung der ordnungsgemässen Deklaration und Versteuerung von mit US-Wertschriften erzielten Einkünften durch US-Steuerpflichtige und zur Schaffung eines Verfahrens, das es Nicht-US-Steuerpflichtigen ermöglicht, eine Entlastung der von den USA pauschal erhobenen Quellensteuern auf mit US-Wertschriften erzielten Einkünften zu erreichen. |
| **Rating Agencies** | Kreditprüfungsagenturen, die Schuldner oder Anlagen aufgrund ihrer Bonität mit bestimmten Noten bewerten (z.B. AAA, B+ usw.). |
| | Kreditprüfungsagenturen wie z.B. Standard & Poor's klassieren Anlageprodukte je nach ihrer Bonität zwischen AAA (höchste Bonität) und D (Konkurs) ein. Die Zwischenstufen (AA+, AA, AA–, A, BBB, BB, B usw.) vermitteln einen Aufschluss über das vermutete Ausfallrisiko. Anlagen mit einer Bonität von BBB– oder mehr werden als hochwertige Anlageprodukte («Investment Grade») bezeichnet, Anlagen mit einer Bonität von BB+ oder weniger als Spekulationspapiere («Speculative Grade»). |
| | Andere Kreditprüfungsagenturen wie Moody's und Fitch wenden vergleichbare Prüfungen an. Der Einfachheit halber ist im vorliegenden Bericht nur von den Einstufungen die Rede, die Standard & Poor's verwendet. |
| **Remediation Plan** | Bericht «UBS's Write-Downs Arising from the Market Dislocation: Lessons Learned and Remediation» der UBS vom 6. Juni 2008 |
| **Renewal Plan** | «UBS Plan for Risk Management & Control Renewal» vom 3. September 2008 |
| **Revised Business Model** | Geschäftsmodell der UBS, das im Jahr 2002 eingeführt wurde und darauf abzielte, bestehende Geschäftsbeziehungen mit US-Kunden in Vermögensverwaltungsmandate zu überführen und Kontakte mit US-Kunden unter Verwendung von «US Jurisdictional Means» zu verbieten. |
| **Schweizerische Nationalbank (SNB)** | Zentralbank der Schweiz, die die Geld- und Währungspolitik der Eidgenossenschaft führt. |
| **SEC Consent Order** | Vergleich vom 18. Februar 2009 zwischen dem DoJ, der SEC und der UBS zur Beilegung der US-amerikanischen Verfahren im Zusammenhang mit dem US-Crossborder-Geschäft |
| **SEC-Restriktionen** | Verschiedene US-Gesetze sowie darauf gestützt erlassene Reglemente, welche die grenzüberschreitende Erbringung von Finanzdienstleistungen beschränken. |
| **Securities and Exchange Commission (SEC)** | US-amerikanische Finanzmarktaufsichtsbehörde |
| **Securitized Product Group Proprietary Trading Desk** | Geschäftseinheit innerhalb der Investmentbank der UBS, die Investitionen in strukturierte Produkte auf eigene Rechnung vornahm. |
| **SIX Swiss Exchange (SIX)** | Die SIX Swiss Exchange ist die Schweizer Börse. Als solche betreibt diese mehrere Handelsplattformen und ist Marktplatz für verschiedene Wertpapiersegmente (Schweizer Aktien, Schweizer-Franken-Anleihen usw.). Im Rahmen der im Börsengesetz vorgesehenen regulatorischen Aufgaben bestimmt die SIX die Anforderungen für die Kotierung und deren Aufrechterhaltung. |
| **Special Purpose Vehicle (SPV)** | Ein SPV ist eine rechtlich und wirtschaftlich selbständige Zweckgesellschaft. Sie wird beispielsweise dazu gegründet, im Rahmen einer Verbriefungstransaktion bestimmte Forderungen anzukaufen und die erforderliche Refinanzierung über die Emission von Wertpapieren zu generieren. Das SPV hat keinerlei Zugriff auf die Aktiva, so dass die erworbenen Forderungen den Investoren vollständig als Sicherheit dienen. |
| **SSG** | Senior Supervisors Group |

| Term | Definition |
|---|---|
| **StGB** | Schweizerisches Strafgesetzbuch |
| **Stresstest** | Verlustpotenzialanalyse, die über die Einkommens- und Solvenzsituation eines Finanzinstitutes bei möglichen Szenarien Auskunft geben soll. Stresstests werden oft von den einzelnen Instituten wie auch von den Aufsichtsbehörden und den Zentralbanken eingesetzt. |
| **Subprime** | Subprime-Hypotheken bezeichnen jene Hypothekarkredite, die an Konsumenten mit geringerer Bonität (Schuldnerqualität) oder finanzieller Kraft vergeben werden. |
| **Subprime-Wertschriften** | Effekten, denen Kredite oder Hypotheken für Kreditnehmer mit eingeschränkter oder ungenügender Bonität zugrunde liegen. |
| **Super-Senior** | Als Super-Senior bezeichnet man bei Asset-Backed Securities oder CDOs eine Verbriefungstranche, die hinsichtlich der Verlustübernahme nachrangig zur Senior-Tranche (meistens AAA-Rating) steht. Die Super-Senior-Tranche besitzt daher ein noch geringeres Ausfallrisiko als die Senior-Tranche. |
| **UBS** | UBS AG |
| **UBS Financial Advisors AG (UBS SFA AG)** | Eine im Jahr 2005 gegründete Tochtergesellschaft der UBS, die (im Gegensatz zur UBS) über eine Bewilligung als Wertschriftenhändlerin in den USA verfügte. |
| **UBS Shareholder Report** | Bericht «Shareholder Report on UBS's Write-Downs» der UBS vom 18. April 2008 |
| **UBS-Bericht an die EBK** | Bericht «Preliminary Report on UBS's Write-Downs Arising from the Market Dislocation» der UBS vom 4. April 2008 |
| **Umstrukturierungen – Switches** | Zwischen die Bank und den US-Steuerpflichtigen, der bisher Vertragspartner der Bank war, wird eine nicht in den USA domizilierte Gesellschaft (häufig eine Offshore-Sitzgesellschaft) geschaltet, wobei der bisherige Kontoinhaber an den von der dazwischengeschobenen Gesellschaft gehaltenen Vermögenswerten aber direkt oder indirekt wirtschaftlich berechtigt bleibt. |
| **Umstrukturierungen – Upgrades** | Umgestaltung einer Gesellschaftsstruktur (z.B. Rechtskleidwechsel oder Dazwischenschalten einer Offshore-Sitzgesellschaft), damit die steuerliche Eigenständigkeit der gewählten Struktur anerkannt wird und die von dieser Struktur gehaltenen Vermögenswerte nicht dem dahinterstehenden wirtschaftlich Berechtigten zugerechnet werden können. |
| **US-Crossborder-Geschäft** | Vermögensverwaltungsgeschäft der UBS mit US-Kunden, die bei einer Geschäftsstelle der UBS ausserhalb der USA eine Kontobeziehung unterhielten. |
| **US Jurisdictional Means** | Darunter fällt beispielsweise jegliche Kommunikation in die USA unter Verwendung von E-Mail, Telefon, Telefax oder Post. |
| **Value-at-Risk** | Statistisches Risikomass, das in der Finanzbranche oft zur Beurteilung möglicher Verluste verwendet wird. Der VaR gibt den Verlust an, der eine Risikoposition innerhalb eines bestimmten Zeithorizontes mit einer bestimmten Sicherheitswahrscheinlichkeit (Konfidenzniveau) nicht überschreitet. Beispielsweise bedeutet ein VaR von CHF 100 Millionen bei einer Haltedauer von zehn Tagen sowie einem Konfidenzniveau von 95%, dass der mögliche Verlust der Risikoposition in den nächsten zehn Tagen mit einer Wahrscheinlichkeit von 5% CHF 100 Millionen überschreitet. |
| **Verbriefung** | Für eine Verbriefung überträgt der Verkäufer bestimmte Vermögensgegenstände in der Regel auf eine Zweckgesellschaft (SPV), die sich wiederum durch die Ausgabe von mit den ursprünglichen Vermögensgegenständen besicherten Effekten refinanziert (siehe Asset-Backed Securities). |
| **Wachtell** | US-amerikanische Anwaltskanzlei Wachtell, Lipton, Rosen & Katz |
| **Wachtell-Bericht** | Bericht von Wachtell vom 14. Oktober 2008 |
| **Withholding Agent** | Zahlstelle, die gegenüber dem IRS über die von einer US-steuerpflichtigen Person mit US-Wertschriften erzielten Einkünfte in einem Meldeverfahren unter Angabe der Identität des betreffenden Steuerpflichtigen bzw. von dessen Steuer-Identifikationsnummer abzurechnen hat. |
| **Zahlstelle** | Stelle, welche die Auszahlung von Dividenden auf Aktien oder Zinsen auf Obligationen amerikanischer Unternehmen vornimmt. |



UBS AG
Postfach, CH-8098 Zürich
Postfach, CH-4002 Basel

www.ubs.com