UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 08-60322-CR-COHN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

RAOUL WEIL,

        Defendant.

_____/

**RAOUL WEIL'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE
AND ARGUMENT CONCERNING ALLEGED VIOLATIONS OF THE
"DEEMED SALES RULES"**

Defendant Raoul Weil respectfully requests that the Court exclude all evidence and argument relating to any alleged violation by UBS AG ("UBS" or "the Bank") of the so-called "deemed sales rules," including relating to any alleged failure by UBS to report or withhold on sales of foreign securities by U.S. customers. Under the 2001 Qualified Intermediary ("QI") Agreement with the Internal Revenue Service ("IRS"), the deemed sales rules applied to U.S. securities only, and UBS had no obligation to report or withhold on sales of foreign securities. Any alleged conspiracy to defraud IRS premised on UBS's failure to meet this non-existent obligation is thus legally impossible, and the Government should be precluded from introducing irrelevant, misleading, and prejudicial evidence that suggests otherwise.

In related civil litigation with UBS, IRS Deputy Commissioner Barry Shott acknowledged in a 2009 sworn deposition that the deemed sales rules applied exclusively to sales of U.S. securities. Former IRS-Associate Chief Counsel International John Staples, who personally oversaw IRS's efforts in drafting and implementing the QI

1

Agreement in the late 90s and early 2000s, likewise confirms that the application of the deemed sales rules was intentionally limited to sales of U.S. securities and that UBS had no obligation to report or withhold on foreign security sales under the QI Agreement.

The Government conceded in a telephone conference with the Defense last week that it no longer intends to argue affirmatively that the deemed sales rules applied to sales of foreign securities, but that it still plans to try to introduce documentary evidence and witness testimony that the deemed sales rules applied to sales of foreign securities (as well as to other conduct that did not trigger the deemed sales rules) as a means of establishing Mr. Weil's alleged criminal liability. It would be profoundly misleading and confusing to the jury to allow the Government to present an incorrect construction of an already highly technical document and area of the law in an effort to prove that Mr. Weil conspired to defraud IRS. UBS had no obligation to report sales of foreign securities, and the Government should not be allowed to argue or to introduce evidence that suggests that it did.

## BACKGROUND

IRS launched the QI program in 2001. The primary purpose of the program was to improve the collection of withholding taxes on U.S.-source income paid to non-U.S. persons by providing a simplified and comprehensive reporting and withholding framework for participating foreign banks such as UBS that elected to become Qualified Intermediaries ("QIs"). *See* UBS AG Deferred Prosecution Agreement, Ex. C, Statement of Facts (Feb. 16, 2009) (noting that the purpose of the QI program was "to provide a comprehensive framework for U.S. information reporting and tax withholding by a non-U.S. financial institution that acts as a QI with respect to customer accounts held by non-

U.S. persons and by U.S. persons"). As Mr. Staples confirms, in drafting and implementing the QI Agreement, IRS was principally concerned with information reporting and withholding on U.S.-source income paid to non-U.S. persons (Non-Resident Aliens or NRAs), but in the course of ensuring compliance for non-U.S. customers, UBS's QI Agreement also set out UBS's obligations with respect to its U.S. customers. *See* Accompanying Decl. of John Staples, former IRS Associate Chief Counsel International ("Staples Decl.") ¶¶ 6, 15 & 17.

Section 3.05 of the QIA, sets forth an exclusive list of a QI's backup withholding and Form 1099 reporting obligations. This section, by cross-reference to section 2.44(B) states that a QI has primary Form 1099 and backup withholding responsibility for: (i) "reportable amounts," namely, dividends and interest derived from U.S. securities; (ii) proceeds from a sale of assets that produced or could produce reportable amounts (*i.e.*, U.S. securities), if the sale was effected or deemed to have been effected in the United States within the meaning of the deemed sales regulation in Treasury Regulation § 1.6045-1(g)(3); (iii) foreign source income (namely, interest and dividends) paid in the United States or to a U.S. account of a U.S. person; and (iv) any gross proceeds from the sale of assets that produced, or could produce, reportable amounts (*i.e.,* U.S. securities) that were beneficially owned by a U.S. person who was not otherwise exempt from Form 1099 reporting if the identity and account information of such a U.S. person was prohibited by law from disclosure (i.e., U.S. persons who neither signed a W-9 nor sold their U.S. securities). *See* QI Agreement §§ 2.44(B), 3.05(B) & 3.07. The QI Agreement imposed no reporting or backup withholding obligation for gross proceeds generated from the sale of foreign securities, even if the security sales were executed using U.S. jurisdictional

3

means. *See id.* (setting forth UBS's sole reporting and withholding obligations and not including proceeds from the sale of foreign securities). Accordingly, under the QI Agreement, the application of the deemed sales rules was limited to sales of U.S. securities, and UBS was not required to report or withhold on sales of foreign securities. Mr. Staples, who oversaw the drafting of the QI Agreement on behalf of IRS, has confirmed in a sworn declaration that this limitation was deliberate. *See* Staples Decl. ¶ 20.

IRS has also acknowledged that, under the QI Agreement, the deemed sales rules applied exclusively to sales of U.S. securities. In connection with litigation over the Government's *John Doe* summons to UBS, then-IRS Deputy Commissioner (International) Barry Shott was questioned in a sworn deposition by counsel for UBS on the application of the deemed sales rules under the QI Agreement:

> Question: So in other words, this deemed sales concept, it could never apply to require backup withholding on proceeds of sales of foreign securities?
>
> [Mr. Shott]: It's US securities only.
>
> Question: Not foreign?
>
> [Mr. Shott]: Correct.

*See* Declaration of Kimberly Zelnick[1] ("Zelnick Decl."), Ex. B, Excerpts of Videotaped Deposition of Barry B. Shott at 22 (June 25, 2009). To ensure that the record was clear – since Mr. Shott had taken a contrary position in a prior declaration – UBS counsel had the record read back to Mr. Shott, who reconfirmed that the deemed sales rules applied to "US securities only." *Id.*

---

[1] Pursuant to the Court's Sealed Order on Supplemental Motion for Protective Discovery (DE 68), the Zelnick Declaration has been filed under seal.

4

Notwithstanding IRS Deputy Commissioner Shott's admission, in negotiating the Statement of the Case that this Court will read to prospective jurors during *voir dire*, the Government initially proposed inserting language that under the QI Agreement, UBS was required "to withhold taxes from U.S. clients who directed their investment activities in *foreign securities* from the United States." (emphasis added). The Government further stated that it intended to prove the *Klein* conspiracy with which Mr. Weil has been charged by demonstrating that the Bank failed to withhold under the deemed sales rules. In our discussions with the Government, we rejected the Government's proposed insertion into the Statement of the Case since UBS in fact had no obligation under the QI Agreement to report or withhold on sales of foreign securities, regardless of how or from where UBS's U.S. customers transmitted sale instructions. The Government dropped the point.

But on October 1, 2014, less than two weeks before trial, the Government advised that it plans to introduce numerous exhibits that relate to the deemed sales rules' purported application to foreign securities and also to elicit testimony from Swiss bankers – with no expertise in U.S. tax law – that the Bank violated the deemed sales rules and the QI Agreement by allegedly permitting its Swiss client advisors to:

(i)   communicate with U.S. customers;

(ii)  meet with U.S. customers in the United States;

(iii) accept and solicit U.S. customer foreign security sales and purchases; and

(iv)  confirm an order for a foreign security transaction by, for example, providing a U.S. customer with his UBS account statement

(and then, presumably, failing to report or withhold on the U.S. customers' foreign security sales). In short, the Government proposes to introduce evidence that would stretch the deemed sales rules beyond all recognition and suggest that any U.S. contact in connection

5

with any security transaction triggered a reporting or withholding obligation under the QI Agreement with which the Bank did not comply. *See* Zelnick Decl. ¶¶ 7-8 (describing affidavit of a Government witness who misstates the deemed sales rules and then asserts, erroneously, in 11 paragraphs, that the Bank violated the QI Agreement by failing to comply with the deemed sales rules); *id.* ¶¶ 9-11 (detailing memoranda of interviews of multiple other Government witnesses who incorrectly describe the deemed sales rules and then repeatedly state that the Bank violated the rules and thereby the QI Agreement); *id.* ¶ 5 (listing multiple exhibits that the Government proposes to introduce, which reflect incorrect summaries of the Bank's obligations under the QI Agreement and emphasize, in particular and erroneously, the applicability of the deemed sales rules to foreign securities).

The Government now appears to acknowledge – or at least not to refute – that none of this alleged conduct would constitute a violation of the QI Agreement, the deemed sales rules, or U.S. tax law. The Government has stated, however, that even though it will not try to resuscitate its prior contention that UBS violated the QI Agreement by failing to report or withhold on sales of foreign securities under the deemed sales rules, it nonetheless will attempt to introduce this very evidence at Mr. Weil's trial.

As a matter of law, the Bank had no reporting obligation with respect to sales or purchases of foreign securities. Evidence of the Bank's alleged failure to comply with a non-existent obligation is therefore probative of nothing and is inadmissible under Fed. R. Evid. 402. And even if that were not the case, the Government should be barred under Fed. R. Evid. 403 from introducing such prejudicial, confusing, and misleading evidence. The tax issues in this case will be difficult enough for jurors to understand and apply without the additional complexity of repeated and inaccurate speculation from non-expert,

6

foreign witnesses about what circumstances did and did not trigger reporting obligations for UBS, as well as what conduct ran afoul of the QI Agreement.

Allowing the Government to argue otherwise – either directly or indirectly – will inevitably confuse the jury and, worse, could lead the jury to convict Mr. Weil on the basis of an erroneous conclusion that UBS violated the QI Agreement by engaging in conduct that the Agreement unquestionably permitted. The Government's proposed approach also runs the risk of irrevocably prejudicing Mr. Weil by, in the event of a conviction, making it impossible for this Court to determine whether the jury's verdict was influenced by evidence of actions that never constituted a violation of the QI Agreement, let alone a crime.

## ARGUMENT

### I. Mr. Weil Cannot Have Committed a Crime by Failing To Apply the Deemed Sales Rules to Foreign Security Sales, and Evidence that Suggests Otherwise Is Irrelevant and Inadmissible under Fed. R. Evid. 402

The Government cannot convict Mr. Weil on the basis of "actions which . . . even if fully carried out as he desire[d], would not constitute a crime." *United States v. Oviedo*, 525 F.2d 881, 883 (5th Cir. 1976) (internal citation omitted), *accord United States v. Ballinger*, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005); *see also United States v. Whiteside*, 285 F.3d 1345, 1351 n.1 (11th Cir. 2002) (vacating defendants' conspiracy convictions under 18 U.S.C. §§ 371 and 2 as the defendants' acts were not illegal, and rejecting the Government's interpretation of ambiguous Medicaid regulations because contradictory evidence demonstrated that the defendants' interpretation was not unreasonable); *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000) (holding that "pure legal impossibility is always a defense," including to a 18 U.S.C. § 371 conspiracy, where the Government

7

failed to allege any conduct that could be considered a crime under federal election law) ("[A] hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in the first place.") (citations and quotations omitted).[2]

In order to establish the Section 371 conspiracy charged against Mr. Weil, the Government must prove a "common agreement to violate the law." *United States v. Kottwitz*, 614 F.3d 1241, 1264-65 (11th Cir. 2010), *opinion withdrawn in part on denial of reh'g on other grounds*, 627 F.3d 1383 (11th Cir. 2010). No conspiracy exists where the act contemplated by the alleged co-conspirators is not illegal. *See id.* ("A conspiracy conviction cannot stand without evidence showing a meeting of the minds to commit the illegal act."); *see also United States v. Ali*, 561 F. Supp. 2d 265, 266 (E.D.N.Y. 2008) ("Where the act contemplated is not criminal, nothing criminal has crystallized, and any perceived threat to social order dissipates. It matters not that the alleged conspirators mistakenly believe that they are actually agreeing to do something the law forbids.").

The contention that the deemed sales rules applied to sales of foreign securities in the QI regime is incorrect as a matter of law as confirmed by the IRS Associate Chief Counsel who led the drafting and implementation of the QI Agreement for the United States. *See* Staples Decl. ¶ 20. It is at odds with admissions made by the IRS Deputy Commissioner in a sworn deposition in the UBS litigation. *See* Zelnick Decl. Ex. B. The

---

[2] Although the Eleventh Circuit has stated on occasion that "impossibility is no defense to . . . conspiracy," in such instances, it was referring to *factual* impossibility rather than pure legal impossibility. *Compare United States v. Nunez-Valencia*, 486 F. App'x 108, 111 (11th Cir. 2012) (quotations omitted) (rejecting factual impossibility defense to conspiracy where the defendant alleged there was no proof that he had the means to purchase the $100,000 in cocaine that the Government alleged he had conspired to buy), *with Whiteside*, 285 F.3d at 1351 n.1 ("Since the defendants' act . . . was not an illegal act, it follows *a fortiori* that defendants' alleged 'agreement' . . . was not a criminal conspiracy.").

Government is now trying to criminalize what the QI Agreement expressly made legal. But not even *civil* liability would be triggered by a failure by UBS (or Mr. Weil) to apply the deemed sales rules to foreign security sales.[3]  Because Mr. Weil could not possibly have defrauded IRS by failing to comply with a non-existent requirement, the proposed evidence of violations of the deemed sales rules should be excluded as irrelevant and inadmissible under Fed. R. Evid. 402.

II.     **Allowing the Government To Present Evidence that UBS Violated the QI Agreement by Failing To Apply the Deemed Sales Rules to Foreign Security Sales Would Confuse the Jury and Be Unfairly Prejudicial**

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, . . . ."  Fed. R. Evid. 403.  Evidence that UBS failed to report or withhold on gross proceeds generated through the sale of foreign securities would have no probative value because it was never a violation of the QI Agreement and cannot be the basis for a criminal offense.  *See United States v. Gengler*, 1:08CR12, 2009 WL 5549225, at *9 (E.D. Va. Oct. 23, 2009) (holding that where an act "is not illegal or inherently

---

[3] Given the highly technical nature of the QI Agreement itself, and the opaqueness of the deemed sales rules in particular, it would also be impossible for anyone, let alone Mr. Weil – a Swiss national with no expertise in U.S. tax law – to have formed the requisite criminal intent to defraud IRS by misapplying the deemed sales rules. *Cf. United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985) ("It is settled . . . that where [tax] law is vague or highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it.  Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.") (citations and quotations omitted); *see also Whiteside*, 285 F.3d at 1353 (citing *Mallas* with approval); *United States v. Lebowitz*, 676 F.3d 1000, 1012 (11th Cir. 2012) (holding that a criminal statute is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair warning, or authorizes arbitrary and discriminatory enforcement"). Given the fact that experienced prosecutors from DOJ's Tax Division themselves have misinterpreted the basic elements of the QI Agreement in this very case, it is inconceivable that a lay person of even high intelligence, such as Mr. Weil, could have formed the requisite intent to defraud by violating the deemed sales rules.

9

fraudulent, an agreement to [commit that act], by itself, does not permit a reasonable inference that there is an agreement to commit a crime"). It will also inevitably confuse the jury. *See United States v. Stein*, 521 F. Supp. 2d 266, 270 (S.D.N.Y. 2007) (excluding uncharged evidence relating to complex issues of tax law under Rule 403 and observing that where "experienced AUSAs could not get the [tax issue] straight, the risk of juror confusion is obvious"); *see also United States v. Griffin*, 778 F.2d 707, 709 (11th Cir. 1985) ("Federal Rule of Evidence 403 vests trial judges with the discretion to exclude relevant evidence where probative value is substantially outweighed by unfair prejudice.").

In a case where one of the central allegations is that Mr. Weil conspired to defraud IRS by "enter[ing] into the QI Agreement and represent[ing] to the IRS that [UBS] was in compliance with the terms of the QI Agreement, while knowing that the U.S. cross border business . . . was not" (Indictment ¶ 16), it is difficult to imagine something more prejudicial than the repeated introduction of testimony and documentary evidence that suggests that the Bank was violating the QI Agreement by failing correctly to apply the deemed sales rules even though – as a matter of law – the QI Agreement did not require the Bank to do what the witnesses and documents erroneously suggested it did require. *Cf. United States v. Jakeway*, 783 F. Supp. 590, 595-96 (M.D. Fla. 1992) (granting a new trial after the government "repeatedly confused [the defendant's] ethical shortcomings and possible regulatory violations with substantive proscriptions of criminal law," thereby "prejudice[ing] the defendants in the eyes of the jury."); *see also United States v. Minarik*, 875 F.2d 1186, 1196 (6th Cir. 1989) (upholding judgment of acquittal in part because "the prosecutors, either intentionally or unintentionally, used the defraud clause [in 18 U.S.C. § 371] in a way that created great confusion about the conduct claimed to be illegal").

10

Permitting the Government to present such evidence would require repeated, extensive, and complicated instructions to the jury on tax rules whose scope and application even tax experts have difficulty articulating.  Indeed, if Mr. Weil is convicted on such a record, it will be impossible for this or any other Court to disentangle whether the conviction arose from evidence that Mr. Weil conspired to defraud IRS as opposed to the introduction of the misleading and confusing documents and testimony that the Government proposes to present.  *Cf. United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980) (vacating a conviction where the government "attempt[ed] to bootstrap a series of checking account overdrafts, a civil regulatory violation, into an equal amount of misapplication [of bank fund] felonies" and the Court of Appeals could not determine, "after examining the record of the trial . . . whether [the defendant, Chairman of the bank] was found guilty of willful misapplication with intent to injure and defraud the bank or whether he was given eighteen concurrent 5-year sentences and fined $90,000 for overdrafting his checking account").

UBS had no obligation to report or withhold on the proceeds of sales of foreign securities paid into accounts maintained outside the United States, and Mr. Weil cannot be guilty of a crime if UBS failed to do so.

## CONCLUSION

For the foregoing reasons, Mr. Weil requests an order precluding all evidence and argument relating to alleged violations of the deemed sales rules.

Respectfully submitted,

Aaron R. Marcu, *pro hac vice*
Kimberly H. Zelnick, *pro hac vice*
FRESHFIELDS BRUCKHAUS DERINGER US LLP

11

      601 Lexington Avenue
      New York, NY 10022
      Telephone: 212.284.4954
      Fax: 646.521.5754
      aaron.marcu@freshfields.com
      kimberly.zelnick@freshfields.com

      Matthew Menchel
      Adriana Riviere-Badell (30572)
      KOBRE & KIM LLP
      2 South Biscayne Boulevard
      35th Floor
      Miami, FL 33131
      Telephone: 305.967.6100
      Fax: 305.967.6120
      matthew.menchel@kobrekim.com
      adriana.riviere-badell@kobrekim.com

By: /s/ Matthew Menchel
      Matthew Menchel
      Florida Bar No. 12043

      *Counsel for the Defendant Raoul Weil*

**CERTIFICATE OF SERVICE**

  I hereby certify that, on October 6, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  I further certify that the foregoing document is being served on all counsel of record identified on the list below via transmission of Notices of Electronic Filing generated by CM/ECF.


Mark F. Daly
US Department of Justice
Tax Division
601 D Street NW
Room 7334
Washington, DC 20579
Telephone: 202.616.2245
mark.f.daly@usdoj.gov

Jason Poole
US Attorney's Office
Department of Justice, Tax Division
601 D. Street NW
Washington, DC 20004
jason.h.poole@usdoj.gov

                By: /s/ Matthew Menchel